Whitakee, Judge,
delivered the opinion of the court:
Plaintiff, a former Army reserve officer, sues to recover disability retired pay from July 18, 1946, to date, less disability compensation received from the Veterans Administration. He claims the action of the Army Eetiring Board, which declined to discharge him for physical disability, and the action of the Correction Board in refusing to set aside the action of the Eetiring Board, were arbitrary and capricious.
On September 12, 1945, plaintiff, a staff supply and logistics officer in the Pacific Theatre, was wounded by a 30-caliber bullet, which struck him in the abdomen and lodged in his left hip. An exploratory operation was performed but it was decided not to remove the bullet. He was returned to duty on October 2,1945.
The bullet wound healed, apparently without complications ; however, on January 7,1946, plaintiff was admitted to *560 Lovell General Army Hospital in Boston for further consideration of the advisability of removing the bullet. After X-raying and otherwise thoroughly examining plaintiff, the chief of the orthopedic service determined that the disability from the bullet was negligible, that the bullet was not a disturbing factor, and that an attempt to remove it might be more disabling than to leave it alone. On February 25,1946, plaintiff was released from the hospital for general service. On April 29,1946, he returned to the hospital this time complaining of burning eyes and rectal soreness. He remained there two months, during which time he was given numerous tests and examinations, including X-rays. There was no change in the conclusion that it was inadvisable to remove the bullet. There were no significant psychiatric or neurological findings developed, and on May 31, 1946, plaintiff was again returned to general service.
On July 18,1946, plaintiff was honorably discharged from the service in the grade of captain, not because of physical disability, but because he had accumulated sufficient points to be eligible for discharge.
After his discharge, plaintiff’s physical condition having grown worse, he filed a claim on August 13, 1946, with the Veterans Administration. Plaintiff’s ailments at this time were diagnosed by that agency as follows:
Conjunctivitis.
Astigmatism.
Otomycocis.
Deviation of the nasal septum, right, mild.
Arthritis, cervical spine suspected (X-ray opinion).
Metallic foreign body, anterior to the neck of the left femur.
No evidence of pulmonary disease.
Later, on November 4, 1946, plaintiff was given a special orthopedic examination by the Veterans Administration, when his condition was diagnosed as:
1. Probably arthritis, cervical spine, by X-ray evidence.
2. Ulcer, peptic, active, lesser curvature of stomach.
3. Foreign body (metallic), soft tissue, left femur.
As a result, on December 4,1946, plaintiff was given a combined 40 percent disability rating from July 19, 1946, the *561 day after he was discharged. Thirty percent was allowed for the bullet wound and scar, and 10 percent for the arthritis of the cervical spine.
About 10 months later, on October 1, 1947, the Veterans Administration again examined plaintiff, but his combined disability rating was continued unchanged at 40 percent.
On March 5,1948, at the request of the Disabled American Veterans Administration, the Veterans Administration reopened plaintiff’s case and gave him a further physical examination. X-rays showed no significant changes in his condition. While no precise diagnosis was made of the cause of the recurring fever, of which plaintiff was complaining, blood smears for malarial parasites were negative. A neurological examination revealed in part:
* * * Aside from a slight restriction in the full elevation of the straight legs ultimately, there is a certain amount of diminution in the power of extension in the left lower extremity, where there is a difference of %" in circumference in the measurements above the knee (the left measures 14%" just above the knee whereas the right at that level measures 15"). At mid-thigh the left measures 19%"; the right 20". The right anterior thigh is much more acute in its perception of pinprick than the left anterior thigh, where there is hypesthesia [impairment of sensation] to pinprick and rather suggests that there may have been some injury to the left anterior crural nerve at the time the patient was wounded. The measurements of the lower extremities, below the knees correspond. The upper abdominal reflexes are quite lively and about equal, but the lower abdominal is not responsive. The right lower abdominal reflex is very dull. The left cremasteric [muscle that draws up the testis] is very dull; right cremasteric dull. The patellas [kneecaps] are very dull; equally so. Achilles not responsive on either side. No Babxnski or ankle clonus. Gait is steady. Station is good. _ No incoordination of finger movements. Other objective neurological findings are essentially negative.
It was determined that, in addition to the injury to the anterior crural nerve, as set forth above, plaintiff suffered from a psychoneurotic disorder and anxiety reaction.
As a result of this examination, on July 23,1948, plaintiff was given an additional 20 percent disability rating from *562 July 19, 1946, for tbe nerve condition of his leg, and 10 percent for the peptic ulcer from February 8, 1947, to July 31, 1947, but zero percent from August 1,1947.
In the meantime, on January 3, 1947, after his discharge on July 18,1946, plaintiff began trying to get his case before an Army retiring board. On February 25, 1948 he was advised that his request would be granted, if a physical evaluation at Murphy General Hospital indicated it was justified. During May 1948 plaintiff was examined at Murphy General Hospital, as an outpatient. The radiologic, orthopedic, neurologic and psychiatric reports made were all negative. On June 11,1948, the examining neuropsychiatrist stated in his report that there was “no evidence for [sic] either any neurologic or psychiatric disease.”
After reports of the results of the examinations, on June 24, 1948, a disposition board at Murphy General Hospital, after considering plaintiff’s clinical records, laboratory findings, physical examination and history of complaints, found that plaintiff was fully qualified for full military duty, but, nevertheless, it ordered him to appear before a retiring board.
On August 3, 1948, plaintiff entered the hospital as a patient and remained there until August 9, in order that observations could be made to determine the cause of his fever. However, his temperature remained normal, and the cause of his fever was not established.
Plaintiff appeared before an Army retiring board, which met at Murphy General Hospital, on August 6, 1948. This board determined that plaintiff was physically qualified for “full military duty, with a waiver for history of peptic ulcer of duodenum discovered after relief from active duty.” The Surgeon General and the Secretary of the Army concurred and found that plaintiff was physically qualified for general military service as of the date of his discharge on July 18, 1946.
This action plaintiff says was arbitrary and capricious.
On August 13, 1953, plaintiff requested the Army Board for Correction of Military Becords to correct his records to show that he was permanently incapacitated for active service on July 18, 1946. On May 14, 1954, plaintiff’s request was denied without a hearing.
*563 Plaintiff filed his petition in this court on August 5,1954, alleging that the actions of the Retiring Board, the Correction Board, and the Secretary of the Army were arbitrary and capricious. He says there was no evidence to support the findings of the boards and, indeed, that their findings were contrary to the evidence. He says that at the time he appeared before the Retiring Board he was disabled on account of an injury to the anterior crural nerve caused by the bullet in his thigh, and was also disabled by arthritis, and by a peptic ulcer of the duodenum, and that he suffered from recurrent fevers of undetermined origin.
We do not think that plaintiff has sustained his burden of showing by cogent and clearly convincing evidence that the Retiring Board was arbitrary or capricious in finding that he was not incapacitated for active service. There is, of course, a strong presumption that the Retiring Board and the Secretary faithfully discharged the duties imposed upon them by law. Only clearly convincing proof can induce us to hold that a retiring board or the Secretary had arbitrarily or capriciously denied an officer retired pay to which he was entitled. Bad faith will not be attributed to them, unless we are clearly convinced of it. Absent a showing of arbitrary or capricious action, we have no jurisdiction to review the action of the Retiring Board and the Secretary. We cannot substitute our judgment for theirs as to who is fit to serve in the Army. Bowman v. United States, 142 Ct. Cl. 367; Johnson v. United States, 138 Ct. Cl. 81, cert. denied, 355 U.S. 850; Woodford v. United States, 138 Ct. Cl. 228, cert. denied, 355 U.S. 861; Uhley v. United States, 137 Ct. Cl. 275; Girault v. United States, 133 Ct. Cl. 135,; Prichard v. United States, 133 Ct. Cl. 212; Beamish v. United States, 130 Ct. Cl. 767; Holliday v. United States, 128 Ct. Cl. 647; Spencer v. United States, 121 Ct. Cl. 558, cert. denied, 344 U.S. 828. It is only where the decision of the board is clearly unsupported by substantial evidence or when there was a noncompliance with applicable laws and regulations that this court may interfere with the findings of the board. Towell v. United States, 150 Ct. Cl. 422.
In the present case plaintiff’s proof falls far short of convincing us that the actions of the Retiring Board and *564 the Secretary were in willful disregard of plaintiff’s rights, or, in other words, that they were arbitrary and capricious. Plaintiff’s complete medical and clinical records were submitted to the board. Two Army medical officers, who had examined plaintiff at Murphy General Hospital, testified that in their opinion plaintiff was not permanently incapacitated for active service, and that any further treatment was not indicated. This was in accord with the findings of the Disposition Board. In response to a question by a member of the Retiring Board, one of the doctors testified that there was no evidence of a peptic ulcer, no history suggestive of it, and that there were no symptoms which would have been sufficient to warrant the making of a G.I. (gastrointestinal) series. He stated that if an ulcer did exist, it must have been after plaintiff’s release from active service. The conjunctivitis was described as mild, and he stated that the alleged arthritis was not indicated by X-ray.
The only contrary evidence was plaintiff’s own testimony. He summarized his disabilities as including recurring fever, variococele, conjunctivitis, dermatitis, prostatitis, arthritis of the cervical spine, ulcers, and the bullet wound. The doctors said that none of these things, if they really existed, were disabling.
Plaintiff, in rebuttal, testified that the Army doctors all had ignored his complaints of gastric trouble since 1944, but, strangely enough, he said that while a personal physician thought his symptoms indicated ulcers, a G.I. series made on February 20, 1945, was negative.
Not only would it appear that the actions of the Retiring Board and the Secretary were not arbitrary or capricious, but we hardly see how, on the basis of the evidence before them, they could have arrived at any other determination.
Plaintiff undertakes to support his allegation that the finding was arbitrary and capricious by showing, first, what the findings of the Veterans Administration were; second, by showing that he was rejected for military service in Korea in 1951; and, third, by testimony of certain doctors introduced before a commissioner of the court, in which they testified to what they thought plaintiff’s condition must have been when he was discharged.
*565 So far as the action of the Veterans Administration is concerned, we have many times held that the basis for its action is different from the basis npon which a retiring board determines whether or not an officer is entitled to retirement for physical disability, and that a finding by the Veterans Administration, that a plaintiff is disabled, does not show that the finding of the Retiring Board, that he was not entitled to retirement for physical disability, is arbitrary or capricious or even erroneous. Holliday v. United States, supra; Wales v. United States, 132 Ct. Cl. 765; Johnson v. United States, supra. After all, jurisdiction to determine a person’s entitlement to retirement is vested by law in the Retiring Board, and not in the Veterans Administration.
Nor does the finding of the Reserve Officers Evaluation Board on April 21, 1951, that plaintiff was not fit for active service in Korea, show that he was entitled to retirement for physical disability in 1946. Five years had elapsed since plaintiff’s retirement. His condition then is not shown to have been the same as it was when he was retired in 1946. Besides, the standards for original appointment or for recall to active duty are considerably higher than they are for retention on active duty. Towell v. United States, supra. An officer is not given an original appointment unless he is fully qualified physically to perform all the duties of the office; whereas, if he is already in the service and becomes disqualified to perform some duties, he still may be able to perform others sufficiently well to justify his retention.
All the testimony before the Retiring Board and the Secretary, except plaintiff’s own testimony, indicated he was still qualified to discharge at least some of the duties of his office.
No additional evidence was presented to the Correction Board to warrant a hearing by it, except the increase in plaintiff’s disability rating by the Veterans Administration, after the hearing before the Retiring Board. This did not require a reopening of the case, in our opinion. The Veterans Administration rating, which dated back to the date of plaintiff’s discharge, was, first, 40 percent; and not until two years later was it increased to 60 percent. This was not a sufficient indication that the Retiring Board had *566 made an error, in declining to discharge plaintiff for physical disability and, hence, to warrant the Correction Board, seven years later, to reopen the case.[1]
Plaintiff introduced before our Trial Commissioner the testimony of certain doctors who gave their opinions of what plaintiff’s condition had been thirteen years before the date of their examination of him. When we weigh such testimony against the testimony of the Army doctors who gave their opinions of plaintiff’s condition based upon examinations just made, the scales are weighted heavily in favor of the latter testimony.
The admissibility of such testimony is doubtful, anyway; but we suppose it is competent to show that the evidence before the board was so incredible that no one undertaking to arrive at a fair and impartial decision could have given it credence. The testimony introduced in this case falls far short of this.
Plaintiff is not entitled to recover, and his petition will be dismissed.
It is so ordered.
Dureee, Judge; Laramore, Judge; Madden, Judge; and Jones, Chief Judge, concur.
EINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs and arguments of counsel, makes the following findings of fact:
1. Plaintiff, a married citizen residing at Wollaston, Massachusetts, and employed as a civilian armed guard, was inducted into the United States Army as an enlisted man on March 17,1942. He had no physical disabilities at the time, but his physical examination noted that prior to his induction he had had an appendectomy and a herniorrhaphy. In this suit plaintiff seeks retirement denied him for alleged physical disabilities incurred in the military service. The amount of recovery if any is reserved under rule 38(c).
*567 2. Plaintiff applied for appointment as a commissioned officer and on August 6,1942, was given a physical examination. He was found physically qualified and was commissioned a second lieutenant, Army of the United States October 31, 1942.
3. Plaintiff served thereafter in the Pacific Theater as a staff supply and logistics officer. On July 18, 1946, he was honorably separated from the service in the grade of captain. His demobilization was not for physical disability but rather because he had accumulated sufficient points.
4. During the course of plaintiff’s active military service in the Fiji Islands he was treated on September 15,1942, for dysentery, bacillary, acute.
In January 1948 plaintiff suffered from varicocele, a varicose enlargement of the veins of the spermatic cord and underwent a varicocelectomy of the same on February 8,1943. He was discharged to duty improved on February 24, 1943.
On July 4, 1943, plaintiff consulted medical outpatient service for a flushed and feverish condition, headache, nausea, pains in the chest and abdomen, and weakness in his knees. He referred to his dysentery attack of the previous year. On July 11, 1943, reference is made again to a flushed and sick feeling in the stomach and to pains resulting from vomiting alcohol five days previously. No disease was found.
On June 8, 1944, plaintiff was admitted to a station hospital in New Caledonia and the progress notes made at the time state:
For the past three months has had tendency to have temperature elevation up to 99.7° or 99.8° — makes him feel sick in his stomach & have little discomfort & some nausea in the * * * eve. — sometimes when he stands he feels weak, dizzy — occasional slight cough — has headaches & has been treated in nose & throat clinic for (?) sinusitis — frontal headaches frequently.
Plaintiff’s temperature chart showed his temperature to have remained in normal range until he was again released to duty on June 15,1944, with the diagnosis of “no disease.”
Plaintiff’s medical record continued to accumulate and on March 1, 1945, discomfort from his varicocele was again noted.
*568 5. While in active military service plaintiff also was treated for a gunshot wound. On September 12,1945, while plaintiff was in his tent at Del Carmen, Pampanga, Luzon, Philippine Islands, he was wounded by a bullet which came through the canvas of the tent, struck him in the abdomen and lodged in the anterior surface, head of left femur. This 80-caliber bullet remains in his left hip to this day. An exploratory laparotomy was performed but the bullet was not removed. He was released for duty, general service, on October 2,1945.
6. On January 7, 1946, plaintiff was admitted to Lovell General Army Hospital, Boston, Massachusetts, for a determination as to whether another operative attempt should be made to remove the bullet. Plaintiff was complaining of pain in the vicinity of the bullet on heavy work or exertion. He also complained of pain in the vicinity of the left shoulder and leg. He was given X-rays and other examinations and was observed. Ultimately the chief of the orthopedic service determined that the disability was negligible, that the wound had healed without complication, that the bullet was not a disturbing factor, that an attempt to remove it might be more disabling than to leave the bullet alone and he recommended that plaintiff be returned to general duty. The examinations also noted slight varicose veins of undetermined cause. While surgery for the bullet was decided against, and wisely so, it was noted on the medical progress notes that, if plaintiff continued to complain of pain in his hip, further treatment might be necessary.
7. One of the examinations at Lovell General Hospital revealed on January 10, 1946, what was described as a “slight tenderness and moderate thickening of the tissues about the left spermatic cord * * * slight tenderness over right sacroiliac. No restriction of back motion. Straight leg raising normal; motion at left hip is essentially normal.” No apparent injury to the nervous system was found. Plaintiff was released again for general service on February 25,1946. On the following day he was ordered to terminal leave of 103 days to terminate on June 9, 1946. His official date of separation, however, is July 18,1946, as previously noted.
*569 8. Before being separated from the service, however, plaintiff was back in Lovell General Hospital on April 29, 1946, with his chief complaint being “burning eyes” which he advised had bothered him since 1942. Plaintiff also was complaining of rectal soreness from sitting long periods of time during the previous 2 or 3 years. Plaintiff remained in the hospital 2 months and was given numerous medical examinations, X-rays and laboratory tests for the conditions complained of currently and previously. No significant psychiatric or neurological findings developed, notwithstanding a search in these areas for the reasons for his alleged headaches and chest pains which had not been explained by other examinations. Plaintiff was released for general service again on May 31, 1946, with the final diagnoses of (1) ill-defined condition of the coccyx, manifested by pain after sitting long periods of time; (2) hemorrhoids, chronic, mild, external; (8) epididymitis, chronic, left, cause undetermined, nonvenereal, nonsuppurative, mild; and (4) varicocele, cause undetermined, mild.
9. Plaintiff testified that during the course of his treatments at Lovell General Hospital on or about February 23 or 24, 1946, he asked an officer, whom he identified, for the opportunity to appear before an Army disposition board. He was told by this officer, who consulted with a superior officer on the matter, that plaintiff’s disabilities were not of such a nature as to merit consideration by the board and that they could be corrected by rest and recuperation after separation from the service. Plaintiff relied on this advice and submitted no formal or written application for appearance before the board. This testimony was not rebutted.
10. While plaintiff was in Lovell General Army Hospital he was advised by a representative of the Army Medical Officers Association to file a claim with the Veterans Administration. He did so, and on August 13, 1946, after plaintiff was out of the Army, he was given his first medical examination by the Veterans Administration. At that time he described the following subjective symptoms noted on the report of his physical examination:
Eyes still bother him. Shortwinded. Subject to colds. Sharp pains around heart, at times across chest. Left *570 ear itches. Has a little difficulty hearing. Buzzing & Ringing in ear. Abdomen bothers him. Left hip, knee, leg, ache all the time. Bullet is still in hip. Pains in back, neck, left shoulder, left arm. Sharp pain in groin and coccyx. Varicocelectomy still bothers him * * * Patient complains of pain in the region of the cervical spine, which he states he has had for one and a half years. By X-ray the diagnosis is — Suspected arthritis, cervical spine.
11. The Veterans Administration on August 13, 1946, made X-rays of plaintiff’s chest, cervical spine, 'both hip joints and an electrocardiograph. The examining physician referred in his report to plaintiff’s subjective complaint of pain in the left shoulder existing since 1944 and in the region of the cervical spine since 1942.
The final diagnoses were:
Conjunctivitis.
Astigmatism.
Otomycocis.
Deviation of the nasal septum, right, mild.
Arthritis, cervical spine suspected (X-ray opinion). Metallic foreign body, anterior to the neck of the left femur.
No evidence of pulmonary disease.
The Veterans Administration decided plaintiff was not in need of hospitalization.
12. On November 4,1946, plaintiff was again given a medical examination by the Veterans Administration. He described his complaint at that time as follows:
Lf t leg aches, pains; 1ft knee becomes sore & 1ft hip aches; headaches over both eyes.
A special orthopedic examination was accorded plaintiff for his complaints and the examiner stated, in part:
* * * In performing the various orthopedic tests, the patient refers to pain to his left sacroiliac region. He performs all standard orthopedic tests very well. There is no crepitation of the hip or knee joint. There is no limitation. No swelling, redness, or tenderness present at this time.
Diagnoses:
1. Probably arthritis, cervical spine, by X-ray evidence.
*571 2. Ulcer, peptic, active, lesser curvature of stomach.
3. Foreign body (metallic), soft tissue, left femur.
13. The Veterans Administration on December 4, 1946, gave plaintiff a combined 40 percent disability rating from July 19, 1946, the day after he was separated from active military service. Thirty percent of the rating was allowed for “p.O. SOAR SUPRA PUBIC SCAR PENETRATING BULLET WOUND
with retained missile,” and 10 percent was for “arthritis cervical spine on x-ray.” Eating of conjunctivitis and rhinitis was deferred pending receipt of additional records. It was determined and noted that plaintiff had no combat disabilities but his disabilities were service-connected. His numerous other complaints were found to be in the nature of constitutional or developmental abnormalities or not found and not disabilities within the meaning of applicable laws and regulations.
14. On August 1, 1947, plaintiff requested a review by the Veterans Administration of the rating given him on December 4, 1946. He attached to his request a letter dated May 24, 1947, from his personal physician in Brookline, Massachusetts, Dr. Irving H. Park. This doctor stated that he had examined and treated plaintiff since May 6,1947, and made the following diagnoses:
Foreign body left thigh region.
Varicocele, left, marked.
Arthritis, hypertrophic, cervical spine.
Hemorrhoids, external, thrombotic.
Conjunctivitis chronic, cause undetermined.
Otitis externa, cause undetermined.
Varicose veins, moderate severity, bilateral. Spermatocele, left.
Dr. Park stated further:
In my opinion, most or all of these symptoms as evidenced by varicose veins, varicocele, constipation, and thigh tenseness, are caused by some pelvic injury and are all amenable to some form of treatment. He is now being treated expectantly by me with some degree of improvement.
15. Pursuant to request, the Veterans Administration gave plaintiff another medical examination on October 1, 1947. Plaintiff at that time gave as the basis of his current com *572 plaint, subjective symptoms, which he said were complete and which were described by the examining physician as follows:
Bullet wound left hip — bullet still with him — Arthritis in spine at neck — Conjunctivitis—Hemorrhoids still bothering him.
Examination resulted in the following diagnoses:
abdomen
Varicocele, left, moderate, symptomatic
Varicose veins, bilateral, mild.
External thrombotic hemorrhoid
Foreign body, metallic in soft tissue overlying neck of left femur
Early cervical arthritis
Astigmatism
Infection of internal auditory canal, bilateral
Plaintiff’s combined disability rating was continued unchanged at 40 percent. This determination was made on October 27,1947.
16. In the meantime, plaintiff initiated an effort through the Keserve Officers Association on January 8, 1947, to get before an Army retiring board for the purpose of determining his eligibility to receive retirement pay benefits from the date of his separation from the service. On February 5, 1948, the Adjutant General advised plaintiff that his request to appear before an Army retiring board would be given further consideration and on February 25 the Adjutant General informed plaintiff that his request would be granted if indicated after a physical evaluation at Murphy General Hospital. On March 22, 1948, the Adjutant General asked plaintiff to advise of all of his prior hospitalizations in order to facilitate the gathering of all of his clinical records. Plaintiff complied.
17. On March 5, 1948, the Disabled American Veterans Association requested that the Veterans Administration reopen plaintiff’s case; so, in May 1948 while plaintiff was being studied by Army medical officers in preparation for his appearance before an Army retiring board, he was also being studied again by medical officers of the Veterans Administration.
*573 Findings of Fact
Plaintiff complained to tbe Veterans Administration on May 12,1948, of all of the things of which he had previously complained, and X-rays were taken of his left hip region, the cervical and dorsal spine, left shoulder, elbow and wrists. Malarial smears were made. While precise diagnosis was not made of the cause of the fever, the examination of plaintiff’s blood smears for malarial parasites was negative. X-rays showed no significant changes.
18. The Veterans Administration neurological examination in May 1948 revealed, in part:
* * * Aside from a slight restriction in the full elevation of the straight legs ultimately, there is a certain amount of diminution in the power of extension in the left lower extremity, where there is a difference of y%" in circumference in the measurements above the knee, (the left measures 14% " just above the knee whereas the right at that level measures 15"). At mid-thigh the left measures 19%"; the right 20". The right anterior thigh is much more acute in its perception of pinprick than the left anterior thigh, where there is hypes-thesia [impairment of sensation] to pinprick and rather suggests that there may have been some injury to the left anterior crural nerve at the time patient was wounded. The measurements of the lower extremities, below the knees, correspond. The upper abdominal reflexes are quite lively and about equal, but the lower abdominal is not responsive. The right lower abdominal reflex is very dull. The left cremasteric [muscle that draws up the testis] is very dull; right cremasteric dull. The patellas [kneecaps] are very dull; equally so. Achilles not responsive on either side. No Babinski or ankle clonus. Gait is steady. Station is good. No incoordi-nation of finer movements. Other objective neurological findings are essentially negative.
19. The Veterans Administration examination in May 1948 revealed that plaintiff was suffering from a psycho-neurotic disorder and anxiety reaction with moderate impairment and, also, that there was paralysis, anterior crural nerve, left, partial, as noted in the finding above. Examination revealed that the motions of the left hip had full range, but flexion and adduction were painful.
20. As part of its review of plaintiff’s case the Veterans Administration considered a letter from Dr. F. W. Wiklund, *574 Quincy, Massachusetts, to Dr. Park, dated June 16,1948, as follows:
X-Ray Examination of the Cervical Spine:
All the cervical vertebral bodies are in normal alignment in all views. Well defined intervertebral spaces are noted throughout. No old or recent bone injury is visualized. There are no gross arthritic reactions or evidence of destructive bone lesions. Slight narrowing of the C7-T1 intervertebral space appears to be a congenital malformation rather than arthritic degeneration. No cervical ribs are present. No change is seen in the cervical spine examination compared with the previous examination dated 5-10-47.
Thoracic and lumbar Spines:
All the thoracic and lumbar segments are in normal alignment. No congenital anomalies or arthritic changes are seen. Well defined, normal appearing intervertebral spaces are present throughout the thoraco-lumbar region. Minimal arthritic changes are seen at the lower costo-vertebral j oints. No vertebral spurring is noted. Lower spine examination is essentially negative.
21. The Veterans Administration gave plaintiff a new rating on July 28, 1948, and on August 5, 1948, advised him by letter in pertinent part as follows:
The 30% evaluation for bullet wound scar and the 10% evaluation for arthritis condition have been confirmed and continued.
Service connection has been established for paralysis of nerve condition of leg. This condition has been evaluated as 20% disabling from July 19,1946. Service connection has also been established for peptic ulcer condition. This condition has been evaluated as 10% disabling from February 8, 1947 to July 31, 1947 and 0% from August 1,1947.
Service connection has been denied for bronchitis, eye, nervous and rhinitis conditions. It has been determined that these conditions were not incurred in or aggravated by your service in World War II. Therefore, it has been necessary to disallow your claim for these conditions.
This results in a combined disability evaluation of 50% on July 19,1946 to February 7,1947, 60% from February 8,1947 to July 31,1947 and combined 50% disability from *575 August 1, 1947 until further notice. Your account will be adjusted in due course.
22. Plaintiff was given examinations at Murphy General Hospital commencing in May 1948, as heretofore noted. The radiologic, orthopedic, neurologic, and psychiatric reports made were all negative. On June 11, 1948, the Army examining neuropsychiatrist noted:
* * * Subjectively the patient has a large variety of somatic complaints. They may be separated into 2 categories. One set of complaints is associated with pain in and around the left hip, difficulty in walking and paresthesias along the anterior and posterior aspects of both legs. The other set of complaints revolves around a rather unusual area in that the patient starts to develop pain in the middle of the back of the neck and this pain radiates up into the occipital area of the head down along the vertebral column across both shoulders and down to the left ankle. The pain in the neck is present all the time, is a dull aching pain with occasional sharp exacerbation and is aggravated by exertion. It is gradually relieved by rest as are the pains in the left hip and legs.
% :fc % # sfc
Neurological Examination: Cranial nerves 1 thru 12 were intact. Eyes — pupils were equal, round and regular. Extra-ocular movements were normal. There was no [ ?], pupils reacted promptly and equally to light and accommodation. Fundi were normal. Deep tendon reflexes — the right knee jerk was elicited with difficulty and was less active than the left knee jerk. Otherwise the deep tendon reflexes were normally active and equal. There was no ataxia, no Eomberg sign, no ankle clonus and no Babinski. Vibratory sense was intact. Sensory examination — sensory examination was distinguished mainly by the fact that there were many shifting areas of diminished sensitivity to pinprick. These areas followed no consistent pattern and were not constant in that when areas of alleged dullness were re-examined, normal sensitivity to pinprick was observed in all cases. Impression: From the neurological point of view, there is no organic diagnosis which can be made here. From the psychiatric point of view the patient revealed that he was under no unusual emotional stress now or in the past, that his financial background was rather pressing at the present, that he was desirous of retirement but that *576 otherwise everything was in order. We could therefore, find no evidence for either any neurologic or psychiatric disease.
23. Preliminary to appearing before a retiring board plaintiff appeared on June 24, 1948, before a disposition board at Murphy General Hospital. The board considered plaintiff’s clinical records, the laboratory findings and physical examination, and the history of plaintiff’s complaints and made the following diagnoses:
ULCER, peptic of duodenum without obstruction, chronic. ld [Line of Duty] : No.
prostatitis, chronic, non-suppurative, non-venereal, c.u. [cause undetermined]. ld : Yes.
epididymitis, chronic, non-suppurative, non-venereal, c.u.ld: Yes.
astigmatism, compound, hyperopic, bilateral. Vision: cu 20/20. ld: No. epts [existed prior to service]. coNJUNCttvitis, follicular, chronic, bilateral, non-venereal. Vision as in Dg. #4. ld : Yes.
foreign body, retained, bullet, soft tissues medial to neck of femur, left, incurred when struck by enemy rifle bullet ; 12 September 1945, Luzon, P.I. ld : Yes. varicose veins, mild, legs, bilateral, cause undetermined. ld: Yes.
undiagnosed condition, mild, manifested by history of fever, general malaise, pain in the cervical region of the spine and nasal discharge, ld: Yes.
undiagnosed condition, mild, manifested by pain in the neck, pain in the posterior portion of cervical spine, radiating cephalad [toward the head] and caudad [downward] and down the left upper extremity, ld : Yes.
The disposition board recommended that plaintiff was qualified for full military duty and ordered him to appear before a retiring board.
24. Plaintiff had been an outpatient for his examinations at Murphy just prior to appearance before the disposition board. On August 3,1948, however, he entered the hospital and remained there until August 9, 1948, mainly in order that observations could be made in connection with his alleged fever. During this time his temperature remained normal. The cause of his alleged fevers has never been established. For the most part they have been slight. It is *577 found that they are not and never have been permanently disabling.
25. Proceedings before an Army retiring board of five officers took place at Murphy General Hospital, Waltham, Massachusetts, on August 6,1948. Plaintiff was present and was represented by counsel supplied by the Disabled American Veterans Association. Two medical witnesses were heard, Lieutenant Charles H. Kinley and Captain Maxwell E. Hagedorn, both of the Army Medical Corps.
26. Plaintiff testified that who shot him on September 12, 1945, had never been definitely established. He summarized his disabilities to the board as including fevers, varicocele, conjunctivitis, dermatitis, prostatitis, arthritis of the cervical spine, ulcers, and the bullet wound. The plaintiff’s medical records were submitted to the board. Lieutenant Kinley then testified that he had made a joint report with Captain Hagedorn and had examined plaintiff. Their conclusion was that plaintiff was not permanently incapacitated for active service, and that further treatment, hospitalization, or convalescence in Murphy Hospital was not indicated. Plaintiff cross-examined Dr. Kinley challenging only whether a sputum examination had been conducted at Lovell General Hospital.
The board questioned Lieutenant Kinley about a civilian hospital examination of plaintiff in November 1946, indicating a peptic ulcer. The witness stated that in the examinations at Murphy there was no evidence of such an ulcer, no history suggestive of it, and no symptoms previously indicated which would have been sufficient in degree to warrant a G.I. series being made. He stated, further, that if an ulcer did exist it was after plaintiff’s relief from active duty. The conjunctivitis was described as mild and pain in the cervical region of the spine was described as differing in nature when plaintiff had fever.
Plaintiff and his counsel elected not to examine Captain Hagedorn, who corroborated the testimony of Kinley. In response to inquiry from the board, however, the witness referred to the alleged arthritis which he said was not indicated by X-ray.
In rebuttal, plaintiff testified that he had been bothered by gastric trouble since the middle of 1944. He said that the *578 Army medical officers all ignored bis complaints except bis alleged fever, and that while a personal physician thought his symptoms indicated ulcers and made a G.I. series on February 20, 1945, the results, too, were negative. However, he said that these same symptoms when given to the Veterans Administration resulted in its making a G.I. series with the resultant diagnosis of ulcer. He felt that, had the Army at Lovell General Hospital made a G.I. series, it would have found an ulcer, as did the Veterans Administration. He admitted that laboratory and general medical examinations had found no apparent cause for his fevers but referred to other cases believed to be analogous.
The February 20, 1945, medical report referred to by plaintiff was received in evidence by the board, together with documents of the Veterans Administration.
27. On August 6, 1948, the retiring board determined that plaintiff was not permanently incapacitated for active service and recommended “full military duty, with a waiver for history of peptic ulcer of duodenum discovered after relief from active duty.” The board said further:
There is little evidence of peptic ulcer until some time after relief from active duty, and no evidence that such ulcer, if any, was incapacitating during the officer’s tour of duty. Such ulcer always has been largely asymptomatic. All other of this officer’s multiple complaints are due to disorders of mild severity.
28. The Surgeon General’s office on August 16, 1948, and the Secretary of the Army on September 2, 1948, concurred in the action of the retiring board and found plaintiff physically qualified for general military service as of the time he was separated from the service, July 18, 1946.
29. The report of plaintiff’s medical examination at Murphy General Army Hospital, made just before the retiring board proceedings, was sent to the Veterans Administration which considered it on September 30, 1948, but made no change in the rating he was accorded on July 23,1948. However, on February 23,1949, the Veterans Administration did increase plaintiff’s disability rating 10 percent otn the basis of reports from the Brookline, Massachusetts, health department dated January 26 and February 16, 1949, stating that *579 presence of malarial parasites bad been found in smears of plaintiff’s blood. The increased rating was made effective as of January 14,1949.
30. On September g, 1949, plaintiff was admitted for the first time to the veterans’ hospital at West Roxbury, Massachusetts, with his chief complaint at the time being fever of 2 months’ duration. The hospital record says:
This patient gives a long and complicated history which is difficult to unravel. However, he was apparently quite well until August 1942, when, while on the Fiji Islands, he developed chills, fever, and diarrhea. A diagnosis of bacillary dysentery was made. He was treated with sulfa drugs and returned to duty in ten days.
Thereafter the report contains a summary of plaintiff’s numerous complaints and of the thorough examination accorded him at West Roxbury. On admission to the hospital, plaintiff had an oral temperature of 99.2 degrees. He was described as “a well-developed, well-nourished man, whose skin was yellow in color. The patient appeared to be in no distress.” Neurological examinations revealed equal deep tendon reflexes except for the ankle jerks which were not obtained. Abdominal reflexes were normal. X-rays and the G.I. series were normal. The report states:
Throughout his hospital stay, when oral temperatures were taken, he seemed to run a low grade temperature with elevations to 99°. However, during the last week of his hospital stay, rectal temperatures were taken with two elevations to 100° and the rest normal. There was considerable doubt in the opinions of the doctors on the ward as to whether or not he was actually running a temperature elevation. During his hospital stay, he gained 7 lbs. in weight.
Plaintiff was discharged from this hospital on September 9,1949, with the following diagnoses:
Hepatitis, chronic (not found).
Chronic duodenal ulcer (not found).
Prostatitis, chronic — treated—improved.
Foreign body of left hip due to trauma (bullet) — not treated — not improved.
31. The plaintiff entered New England Deaconess Hospital where he remained from November 10 to November 28, *580 1949, for study of tbe fever of approximately 7 years’ alleged duration and presumed to be malaria. It was noted that after discovery of what was presumed to be malarial parasites, some 20 subsequent smears had been negative. The plaintiff’s medical history was summarized in the hospital record, and a neck operation for a glandular trouble in 1915 was noted, together with a double hernia in 1941, and other difficulties which have been referred to previously. Plaintiff’s chest pains were alluded to and the hospital report shows that 20 chest X-rays over a period of 6 or 7 years had all been negative. The general physical examination was stated to be normal. Laboratory investigation, including a smear of blood every 4 hours for 48 hours, was consistently negative for malarial parasites. Plaintiff was advised that gallstones might possibly be responsible for fever with chills and a cholecystectomy was advised. It was performed. Exploration of the stomach and duodenum at the time did not reveal any abnormality. The chief of the medical service of the New England Deaconess Hospital and the professor of tropical diseases at Harvard, who examined plaintiff, stated that prior to plaintiff’s admission to this hospital the diagnosis in regard to the fever had never been established. He stated on December 21,1949, however in a letter to plaintiff’s physician, Dr. Park, that cholelithiasis was the logical and actual cause of plaintiff’s fever. Dr. Park was then of the opinion that with removal of the gallbladder stones plaintiff’s fever would ultimately subside although as of February 20,1950, it continued.
32. Plaintiff subsequently had additional examinations by Veterans Administration. He agreed that removal of his gallstones had reduced his fever to occasional mild attacks with no general over-all sickness therefrom. He still complained of pain in his left hip, leg, neck and back, and of burning eyes, an aching left testicle, and itching ears. Examination in 1950 revealed as follows:
Left hip motions are complete passively and actively. Knee, ankle and foot motions are complete. Power on left not equal to right. Circumference of left thigh is smaller than right. Left calf is %" smaller than right.
*581 33. Plaintiff continued to seek and receive medical examinations by the Veterans Administration. On May 15,1950, the doctor at the facility in Boston noted as follows:
* * * Normal neck motion in all directions. Some pain in hyperextension but no inhibition of motion. Chest and heart negative. No atrophy or limitation of motion of any of the extremities. Both thighs and legs measure the same. Reflexes all within normal limits.
A radiographic report noted that the esophagus, stomach, and duodenum appear normal. The impression was, therefore, gastrointestinal series negative. X-rays of the pelvis, including the left hip and the femur, showed no evidence of bony pathology and revealed the pelvis as having a normal appearance. The final diagnosis was in pertinent part, “cervical arthritis (none found by X-ray).” The other three diagnoses were notations of the various scars and also noted varicocele, left, tender.
The petition avers and the answer admits that by April 16, 1951, plaintiff had been given a combined disabililty rating of 70 percent by the Veterans Administration. Plaintiff had been given a 10 percent rating for the residuals of his gallbladder operation, effective as of February 2, 1950; 10 percent for chronic prostatitis from November 29, 1950; 10 percent for chronic conjunctivitis, and 10 percent for hemorrhoids effective as of March 13,1951. What constitutes the additional 30 percent as of April 16, 1951, does not appear from the evidence.
34. On April 21,1951, plaintiff was given a medical examination for the purpose of determining whether he was qualified for entrance on active duty for service in Korea. There was no change noted in plaintiff’s condition since the time he appeared before the Army retiring board on August 6, 1948. Yet, plaintiff was found not qualified for retention in the Army Reserves by reason of “multiple proven pathology not remediable.” Plaintiff was notified of his physical disqualification for the Reserves on June 4,1951, and on October 8, 1951, was separated from the Reserves by special order.
35. The plaintiff applied to the Army Board for Correction of Military Records on August 13,1953. He said:
*582 I request tbat my records be changed so as to show that upon my separation from active duty in the Army on July 18,1946,1 was permanently incapacitated for active service and was entitled to receive retirement pay benefits.
On May 14, 1954, defendant notified plaintiff, through his attorney, as follows:
A thorough examination of Major Furlong’s Army and pertinent Veterans Administration records, together with the information submitted, fails to indicate that he suffered defects of a degree to have warranted his retirement for physical disability at the time of his separation from the service, 18 July 1946, under the laws, rules, regulations, and policies then in effect. Therefore, the Board has concluded that there is no justification for a formal hearing and review of his case.
36. At the trial of this case in this court, the parties called several qualified medical witnesses, none of whom, however, had examined plaintiff prior to 1959. Dr. Karl C. Corley, a qualified roentgenologist; Dr. Hyman David Shapiro, a qualified neurologist and psychiatrist; Dr. Joseph Bogers Young, a qualified surgeon, and Dr. John Thomas Lord, a qualified neurosurgeon, testified as expert witnesses for plaintiff. Dr. Corley was engaged in his specialty as an officer in the Navy Medical Corps during World War II and the Korean War. Dr. Shapiro and Dr. Young were engaged in their respective specialties as officers in the Army Medical Corps during World War II. Dr. Lord was engaged in his specialty as an officer in the Navy Medical Corps during the Korean War. During their World War II service, Dr. Shapiro and Dr. Young were members of Army retiring boards, and during his Korean War service Dr. Lord was a member of disposition boards, which prepared recommendations for separation from the service based on medical defects. These recommendations were acted upon by retiring boards.
Lieutenant Colonel George J. Hayes, a qualified neurosurgeon testified as an expert witness for the defendant. He is engaged in his specialty as an officer of the Army Medical Corps as chief of the neurosurgical service at Walter Beed Army Medical Center and as consultant in neurosurgery to the Surgeon General. He has been a member of disability *583 discharge boards for enlisted men and lias appeared before retiring boards as a medical witness.
37. Dr. Corley, an expert in the reading of X-rays and the radiologist for the Washington Hospital Center and Doctors Hospital in Washington, D.C., examined the clinical records of plaintiff produced 'by the Army and by the Veterans Administration, which are in evidence in this case. At first he thought that plaintiff’s alleged fevers might be the result of kidney trouble as plaintiff’s records after July 18,1946, show he has a kidney abnormality, which, however, Dr. Corley said was not a disabling condition. He was unable to conclude that this condition did cause the fever.
38. Dr. Corley testified about the possibility of plaintiff’s being disabled as of July 18, 1946, when he was separated from the service, by the disease of arthritis of the spine for which he was given a 10 percent disability rating by the Veterans Administration on December 4, 1946. Dr. Corley examined the Veterans Administration X-rays made of plaintiff in 1948,1950 and 1956. They did not indicate arthritis to him. He was unable to find anything in the Army medical reports on plaintiff to indicate that he had such a condition. It appeared from the Army medical reports that X-rays had been made. They were not found and are not in evidence. References to X-rays of plaintiff’s cervical spine in Veterans Administration reports were too vague and conflicting to be of any value. Plaintiff had complained in August 1946 of pain in the region of his cervical spine, but all Army medical reports were negative on arthritis. He concluded that on account of plaintiff’s subjective complaints of pain, which were not explained by any Army medical examination, it would have been appropriate to have made a myelogram. A myelogram is an examination of the spinal canal by withdrawing the spinal fluid and introducing into the spinal canal an opaque material by which its contour can be demonstrated on an X-ray or fluoroscope. The Army did not do this. He felt a competent neurologic examination would, also, have been appropriate as preliminary to a myelogram. Myelograms were made for and of plaintiff by a civilian doctor on July 9, 1959, in Boston. Dr. Corley examined these. He would not try to interpret them, believing it *584 should be done 'by the neurologist who made them. There is nothing in the record to support any finding by Dr. Corley of arthritis in plaintiff on either July 18, 1946, or August 6, 1948, and Dr. Corley made no such finding.
39. The first record of a peptic ulcer in plaintiff was as a result of an examination by the Veterans Administration in November 1946, referred to in finding 12. The Veterans Administration did not then regard it as disabling. Such an ulcer requires a prescribed diet not available under field conditions. It requires that the patient have feedings six to eight times daily under this diet. Neglect of such an ulcer can cause it to perforate and hemorrhage and develop fatal peritonitis. In Dr. Corley’s opinion, a soldier with such an ulcer is not qualified for full military duty and should be retired for disability. The diagnosis of a peptic ulcer of the stomach is inconsistent with Veterans Administration X-rays made of plaintiff subsequent to November 1946, which show a scarring of the duodenum resulting from the healing of repeated ulcerations in that portion of the G.I. tract, or from an operation for ulcer. Further, the treatment of plaintiff for an ulcer was not consistent with what would be common for a peptic ulcer in the lesser curvature of the stomach. An ulcer was, according to the Veterans Administration, active for about 6 months in 1947 and had been eliminated for a year before plaintiff appeared before the Army retiring board. Based upon plaintiff’s symptoms as he reported them in 1946 and upon examination of the Army and Veterans Administration records in evidence, Dr. Corley was of the opinion that plaintiff was disabled for full military duty on July 18, 1946, from a duodenal ulcer. The evidence cited by Dr. Corley, however, does not support his conclusion that plaintiff was permanently disabled for military duty from any type of ulcer on either July 18, 1946, or August 6, 1948.
40. Dr. Corley was of the opinion that plaintiff was permanently disabled on July 18, 1946, from his bullet wound. However, he did not notice anything in the Army medical records indicating any particular difficulty with the bullet before plaintiff’s release from military service, unless it was a “suspicion that the track of the bullet had been through *585 the genitourinary tract.” He thought it was possibly responsible for plaintiff’s symptoms of prostatitis, epididy-mitis and cystitis. This assumes the bullet went through the prostate gland or in that area. He did not know if it did. Hr. Corley’s evidence was speculative, his examination of the Army records admittedly cursory, and his conclusion about permanent injury from the bullet so conjectural as to be worthy of little weight.
41. Hr. Shapiro, plaintiff’s expert on nerves and mental diseases, gave it as his opinion, based on a review of plaintiff’s medical records, that plaintiff should have been retired for disability on July 18,1946, principally upon the gunshot wound with its neurologic complications and upon the neurological condition as it affected plaintiff’s cervical region. Hr. Shapiro referred to the many months of hospitalization accorded plaintiff by the Army and Veterans Administration and to his subjective complaints of pain. He referred also to the notation on the records of Lovell Army Hospital in January 1946 that, while the wound had healed without apparent complications and no nerve injury, continued complaint of pain might make further treatment necessary. He noted that during the month following plaintiff’s separation from the service he was examined by the Veterans Administration and that this agency determined him to have a 30 percent disability from the bullet wound as of the date of his separation. The Veterans Administration did not, however, make any finding that the “p.o. scab supra pubic soak PENETRATING BULLET WOUNB WITH RETAINED MISSILE,” which plaintiff says damaged certain muscles and nerves, did any nerve damage. Hr. Shapiro, however, relied on subsequent Veterans Administration examinations on May 12 and June 30,1948, which show a i/2-inch atrophy of muscle of the left thigh and a change in sensory perception indicating partial paralysis of the left anterior crural nerves. On July 23, 1948, the Veterans Administration gave plaintiff a rating of 20 percent disability for nerve injury, in addition to the previous 30 percent for muscle involvement due to the wound, and dated it from July 19,1946.
42. As heretofore noted, plaintiff’s complaints of pain and treatment therefor continued both with the Veterans Ad *586 ministration and personal physicians. The Army examination in May 1948, in preparation for appearance before the disposition and retiring boards, showed no neurologic disease, and plaintiff’s complaints of pain were entirely subjective in nature. Dr. Shapiro dismisses the Army examinations and diagnoses as inadequate and poorly done in contrast to those of the Veterans Administration. Dr. Shapiro’s personal examination of plaintiff on April 18, 1959, revealed definite atrophy of plaintiff’s left thigh and limb and certain sensory abnormalities. He agreed that if plaintiff suffered permanent damage to his anterior crural nerve, or nerves, it should have shown at the time of his separation from the service on July 18, 1946, depending, however, on how thorough a neurologic examination was made of plaintiff at that time. Since nothing did show on examination until after plaintiff’s separation from the service, he concluded no adequate neurological examination had been made until subsequent to July 18, 1946. He concluded, further, that plaintiff’s subsequent medical history, together with the course of the bullet being such that it could have hit a nerve or a branch of a nerve, and the decision not to remove the bullet for fear of worse damage to the nerves there, confirms and accounts for permanently disabling pain and nerve paralysis hi plaintiff.
43. Dr. Shapiro acknowledged that some of plaintiff’s medical records indicated suggestive arthritis of the cervical spine and that plaintiff had been given a disability rating therefor by the Veterans Administration. Plaintiff’s complaints of pain in his neck radiating into the back of his head and down his spine since 1942 were not diagnosed by the Army prior to his separation from the service. He was given extensive treatment therefor by the Veterans Administration, including diathermy, physiotherapy, sedatives, and vaccines, and was required at times to wear a Thomas collar and Sayre sling.
Dr. Shapiro agreed with Dr. Corley that the evidence is insufficient to support a diagnosis of arthritis in plaintiff and for this reason agreed with Dr. Corley that a myelogram would be appropriate to determine the real cause of plaintiff’s pain in the cervical region. Arthritis is a progressive *587 disease and, had plaintiff been suffering therefrom at the time of his separation from the service, it would have shown up clearly on subsequent X-rays, which it did not.
44. Numerous things in addition to arthritis of the cervical spine could account for pain such as plaintiff claimed. Dr. Shapiro said it is established by the myelograms of July 8, 1959, made by plaintiff’s private physician, that plaintiff has a paraneural cyst, i.e., a cyst around a nerve. Dr. Corley had also observed, in examining the myelograms, that plaintiff had something of a cystic nature, the significance of which he could not describe and felt it would have to be described by the examining neurologist who made the myelo-grams. The cause of this cyst is unknown. There is nothing to show any connection between the bullet wound and the cyst. Dr. Shapiro’s testimony about the location of the cyst is conflicting. He describes it as in the lumbar region and in the cervical 6 and 7 areas in the neck. Presumably at either place it could cause pain in the cervical spine area, consistent with pain such as described by plaintiff. The weight of the evidence is that if a cyst exists it is in the area of the plaintiff’s neck. A cyst itself is an accumulation of fluid in a sac. It fluctuates in size and this causes the pain to fluctuate. Complete disability from such a cyst is only during a period of acute pain. The cyst causes pressure on a nerve and this sets up the pain. Development of a paraneural cyst is very slowly progressive, and many times it cannot be readily discovered and a patient will be diagnosed for psychoneurosis. Dr. Shapiro examined plaintiff as noted on April 18, 1959. He made no objective neurological findings. His conclusions are based upon plaintiff’s complaints, which are subjective in nature, and upon his examination of the medical records. His conclusion is that the cyst has rendered plaintiff permanently disabled for full military duty by reason of its effect on his cervical region and that good medical practice should have dictated the making of a myelogram, which together with a competent neurologic examination by the Army would have revealed this disability at the time of plaintiff’s separation from the service or upon his subsequent appearance before the retiring board. Neither the Veterans Administration nor the Army made myelograms although *588 they conducted scores of examinations,[1] and plaintiff received extensive treatments for pain in his cervical region. It cannot be concluded, in view of the negative medical reports and X-rays, that they were negligent or did not adhere to good medical practice. It is conjectural whether had they followed the course Dr. Shapiro suggests, after looking back on the situation with the advantage of 13 years of hindsight, that a slowly developing cyst, which even today is minute and its existence a subject of dispute by experts, would have been demonstrated by myelograms. Defendant’s neurologic examinations of plaintiff were thorough and competent. The decision to perform a myelogram must depend on many factors and there is no uniform basis for it.
45. Dr. Joseph Rogers Young was plaintiff’s expert witness with a specialty in general surgery and treatment of injuries. He examined plaintiff’s medical records and the plaintiff himself on July 20,1959, and gave it as his opinion that plaintiff should properly have been retired on July 18, 1946, for four major permanent disabilities. He described these as (1) duodenal ulcer from which plaintiff was suffering clinical symptoms on July 1, 1946; (2) gunshot wound, involving the lower part of the abdomen and extending across the groin and lodging in the left hip, causing, enroute, damage to veins and nerves, particularly the anterior crural nerve, resulting in partial disability of the left lower extremity in the form of a slight atrophy of certain muscles of the leg, which did not however, shorten the leg, and loss of sensory perception in the area; he felt this to be a disabling wound even absent recurring pain; (3) fevers of unknown cause; these fevers elevated plaintiff’s temperature generally not more than a degree or two at intervals over a period of years, making him nauseous, weak and dizzy and accompanied by pains in neck, spine, left shoulder and arm, left hip and leg, and upper chest; Dr. Young disagreed with the disposition board’s diagnosis that the undiagnosed fever was mild because plaintiff’s complaints thereof were too many and over too long a time; and (4) cervical pathology or disease.
*589 Dr. Young thought that any one of these four conditions standing alone would have been sufficient to make plaintiff unfit for general or full military service as of July 18,1946. He did not think that plaintiff’s numerous other alleged physical disabilities, uncomfortable and annoying as they might be, were, even collectively considered, sufficient to justify plaintiff’s retirement, except in consideration with plaintiff’s alleged major disabilities of ulcer, wound, cervical spine, and fever. Plaintiff concedes this and it is so found.
46. Dr. Young said he could identify no change in plaintiff’s condition between the date of the retiring board proceedings, August 6, 1948, and plaintiff’s elimination from the Reserves on April 21, 1951. Pie said there was no evidence in either the Army or Veterans Administration medical records to support any finding that plaintiff became unfit for military duty between those dates. Removal of the gallbladder on November 18, 1949, would not have been a basis for plaintiff’s retirement. Dr. Young’s opinion was that the decision of April 21,1951, was correct and would have been justified on August 6, 1948, and on July 18, 1946.
Dr. Young’s testimony is found to have been cumulative and did not add anything of significant substance to that given by plaintiff’s other witnesses.
47. Defendant’s expert witness, Lieutenant Colonel George J. Hayes, a neurosurgeon with wide experience with combat wounds, had opportunity before he testified to make careful examination of the myelograms in evidence, heretofore referred to and which were made in 1959 by plaintiff’s personal physician. He did not have opportunity to make a careful review of plaintiff’s Army and Veterans Administration medical records. The witness himself does between 250 and 300 myelograms annually.
It was the opinion of this witness that plaintiff’s myelo-grams were normal, showing no cyst and no disease. He stated further that, while cysts sometimes were static, when they become symptomatic there would be a progression and verifiable neurological findings about them over a period of time. He said there were none here. Such a cyst, if evident on myelograms today, would not establish that it had *590 been in existence for 13 years. He could not correlate plaintiff’s subjective symptoms with anything he could see on the myelograms or X-rays. Confronted with plaintiff’s complaints and even with X-rays negative for arthritis, he would not have thought it necessary to make myelograms.
48. The witness Hayes did not evaluate in the same way as plaintiff’s witnesses, the myelogram demonstration of a lateral extension of contrast material along a nerve route with a small punchlike dilation of the extension terminally, opposite what was described as the C-6-7 interspace, that is to say, the interspace between the sixth and seventh cervical vertebrae. He thought this normal, whereas plaintiff’s evidence is that it illustrates a paraneural cyst. He would not deny, however, that the condition described had the ap-pearazice of a paraneural cyst. In short, defendant’s witness, confronted with the same evidence relied upon by plaintiff, simply interprets it differently. He said:
I will not say that this cannot be a reasonable interpretation. I just don’t agree with them.
If a cyst exists, Hayes did not think it serious or disabling or in any way very clinically significant. Speaking generally, Hayes said that a cyst can be broken down by an operation but could not say definitely whether such an operation would be successful in eliminating any disability it may have previously caused. Further, he admitted that it would be possible for a paraneural cyst to exist with resultant nerve route damage, which would cause pain in some people and not in others. His suggestions that what plaintiff’s witnesses took to be a cyst, as shown on the myelograms, might instead be an artifact, such as something on the table or on plaintiff’s skin, were disproved by the evidence. He could not account for the presence of paraneural cysts except by injury or by being congenital in origin. He considered a majority of them to be the latter.
49. Witness Hayes conceded that the bullet necessarily did some damage to the femoral nerve by its passage but considered there was no damage to major blood vessels or to the bone. The fact it did not pass through the plaintiff’s body indicated to him that it had lost a good bit of its muzzle *591 velocity. With, reference to the ^-inch atrophy in the left thigh, he considered that it might be accounted for by the nerve damage. However, he regarded the atrophy as insignificant and functional difference slight, certainly not enough to be totally disabling or to prevent plaintiff from being sent back to duty, as he was shortly after the injury. In his experience and opinion, the injury was inadequate for retirement purposes. The injured thigh showed no marked changes, in his view, and he upheld the Army medical examiner’s determination of June 11, 1948, that there was no neurological disease, as well as the earlier determination that the bullet wound had healed normally and removal of the bullet would be unwise.
50. Witness Hayes disqualified himself to give expert opinions about plaintiff’s alleged fevers and ulcer.
Hayes noted no significant changes in plaintiff’s physical condition between the time plaintiff appeared before the retiring board and April 21, 1951, when eliminated from the Eeserves. He could not account for the development except to suggest that at the time there was a reduction in the Eeserve forces. Hayes said it was necessary to eliminate those who “could not cut the mustard”, that plaintiff was well known as an obvious “sick book rider,” and that it would have been a waste of time to have called him up. He considered that plaintiff’s complaints were subjective in nature and that, in fact, he would have been fit for infantry duty except for his attitude.
51. Plaintiff’s rebuttal witness, Dr. John Thomas Lord, a neurosurgeon, had heard the testimony of Dr. Hayes, defendant’s expert, and had examined the myelograms but had not examined the other medical records in the case. In reference to the myelograms, Dr. Lord considered that they indicated an abnormal prolongation of the arachnoid sleeve at the left C-6-7 space referred to previously. Because asymmetric, he concluded that it was unusual and abnormal and that there was evidence of scarring of the cervical subarach-noid space to a minimal degree and that there was an appearance consistent with a traumatic lesion frequently seen in association with injuries to the nerve root. He was con *592 fident that a cyst believed to be there was not congenital. Congenital cysts are rare in medical literature and, in his opinion, differ from what was shown on the myelogram. He did not think surgery would remedy the situation or eliminate the disabling pain caused thereby although in some cases it was worth trying. Objective findings of such a cyst are inconsistent. The symptoms would justify a myelo-gram in Dr. Lord’s opinion and, had the same been made during plaintiff’s period of service, would have revealed findings similar to those of 1959.
52. Dr. Lord did not examine plaintiff. However, on the basis of his examination of the myelograms made in 1959 and on the basis of plaintiff’s medical record and plaintiff’s symptoms, as called to his attention by counsel, he concluded that plaintiff was not fit for full military duty as an infantryman, and that he would readily break down under combat conditions. He considered him unfit, also, for desk duty in the Army. Dr. Lord said there was no way of telling by X-ray evidence how long the cyst had been there or what accident brought it about, but from what he had heard he concluded that plaintiff had cervical root damage dating from the onset of his symptoms during his period of active military service. He did not regard the cyst as disabling itself but rather an indication of injury causing more or less constant pain provable only by plaintiff’s subjective complaints but sufficiently reliable to justify his retirement for a permanent and nonremedial disability.
Dr. Lord found no abnormalities demonstrated by the X-rays of plaintiff’s cervical spine and no arthritis. In his professional opinion, plaintiff’s injury was to the nerve and not to the spine.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is not entitled to recover, and his petition is therefore dismissed.

 The Veterans Administration finaUy gave plaintiff a rating of 70 percent disability, but this was not until about five years after his discharge.

 There are 175 pages of Army medical records in evidence reflecting examinations of plaintiff and 218 pages of Veterans Administration medical records plus numerous X-rays.