**Frank E. FISHER, Plaintiff–Appellant,**

**v.**

**UNITED STATES, Defendant–Appellee.**

No. 02–5082.

United States Court of Appeals,
Federal Circuit.

DECIDED: April 22, 2004.

J. Bryon Holcomb, of Bainbridge Island, WA, argued for plaintiff-appellant.

Monica J. Palko, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were David M. Cohen, Director; and James M. Kinsella. Of counsel on the brief was Captain Andrew M. Leblanc, United States Air Force, of Arlington, VA. Of counsel was Virginia G. Farrier, Attorney.

Before CLEVENGER, Circuit Judge, PLAGER, Senior Circuit Judge, and DYK, Circuit Judge.

Opinion for the court filed by Senior Circuit Judge PLAGER. Dissenting opinion filed by Circuit Judge DYK.

PLAGER, Senior Circuit Judge.

This case, brought under the Court of Federal Claims' Tucker Act jurisdiction, raises three separate though related questions. First, what must a plaintiff establish regarding the existence of a money-mandating law source in order for the Court of Federal Claims to have subject matter jurisdiction over the case under the Tucker Act? Second, assuming the trial court takes jurisdiction and addresses the merits of the cause, what are the consequences of a failure to prove the elements of the cause of action, either as a matter of construction or interpretation of the money-mandating source, or because the facts of the case do not bring it within the alleged source? And third, even assuming the cause of action is otherwise established, are there issues that, because of their unique military implications, are nonjusticiable?

The plaintiff in this case, Dr. Frank E. Fisher, a physician retired from the Air Force, filed a complaint in the Court of Federal Claims alleging that while he was on active duty, he should have been found unfit for continued service because of a physical disability, and therefore under 10 U.S.C. § 1201 should have been retired for disability, with appropriate retirement pay. The trial court at the behest of the Government dismissed Dr. Fisher's claim for lack of jurisdiction. The trial court indicated that, even if the court had jurisdiction, the matter was exclusively one for military determination, and thus nonjusticiable. Appeal was properly taken.

We conclude that Dr. Fisher's well-pleaded complaint was sufficient to give the Court of Federal Claims jurisdiction over the cause, and that, in light of the statutes on which the cause was based and the facts alleged, the court erred in dismissing the case. We further conclude that under existing law and despite its military origins, the issue is justiciable. The matter is remanded to the trial court for further proceedings in accordance with this opinion.

## I. BACKGROUND

Dr. Frank E. Fisher served as a physician on active duty in the United States Air Force from 1989 to 1996. Thereafter, he served in the United States Air Force Reserves until September 7, 2001, when he was discharged for physical disqualification. While on active duty, Dr. Fisher appeared before three Medical Evaluation Boards (MEBs). The first MEB evaluation took place in May 1994 for Dr. Fisher's complaint of "persistent left shoulder pain." The MEB referred Dr. Fisher's case to an Informal Physical Evaluation Board (IPEB), which determined that his condition did not make him unfit for service. Accordingly, Dr. Fisher continued on active duty.

Dr. Fisher went before a second MEB in September 1995 for "chronic left wrist and hand pain." The MEB again referred the case to an IPEB, which found in October 1995 that Dr. Fisher was unfit for duty and recommended that he be discharged with severance pay and given a 10 percent disability rating. Dr. Fisher disagreed with the IPEB recommendation, alleging that the 10 percent disability rating was too low, and he appealed to a Formal Physical Evaluation Board (FPEB). The FPEB found in November 1995 that Dr. Fisher was "fully capable of performing all of his assigned duties and was doing so routinely." Accordingly, the FPEB found Dr. Fisher fit for duty and recommended

that he be returned to duty. Dr. Fisher did not further challenge this recommendation at the time and returned to duty.

At about the same time that the FPEB was considering Dr. Fisher's case, Dr. Fisher was diagnosed with seronegative rheumatoid arthritis. Apparently that diagnosis was not considered by the FPEB during its deliberations.

In June 1996 Dr. Fisher went before a third MEB, which found him fit for continued military service. Dr. Fisher alleges that the third MEB was convened specifically to consider his diagnosis of seronegative rheumatoid arthritis; however, there is no documentation in the record regarding this third MEB. The MEB did not refer Dr. Fisher to an IPEB, and Dr. Fisher did not challenge this MEB's findings.

At the end of 1996, after completion of his active duty service commitment, Dr. Fisher was released from active duty in the normal course and became a member of the Air Force Reserve.[1] During the time he was serving in the Reserves, he applied to the Department of Veterans Affairs (VA) for disability compensation. In March 1997 the VA awarded him a 40 percent service-connected disability rating for rheumatoid arthritis and a 20 percent rating for degenerative joint disease, which, using a combined rating table, established an overall rating of 50 percent. Dr. Fisher later was awarded an additional 10 percent disability rating for depression, which was increased to 30 percent in October 1997.

In December 1999, Dr. Fisher applied to the Air Force Board for Correction of Military Records (AFBCMR), alleging that the various medical boards before which he appeared should not have found him fit for duty and should have granted him a medical discharge. He requested that his records be corrected to show a medical disability based on rheumatoid arthritis and that he be discharged with a medical disability as of December 31, 1996, his last day of active duty. The AFBCMR denied Dr. Fisher's claim, determining that he had not demonstrated "the existence of probable material error or injustice."

Following the adverse decision of the AFBCMR, Dr. Fisher filed suit in the United States Court of Federal Claims. His complaint alleged that the actions of the Secretary of the Air Force and the AFBCMR were contrary to Air Force statutes, rules, and regulations. He asked the court to reinstate him to active duty, place him in disability retirement status effective January 1, 1997, award him medical retirement back pay from that date, and order the correction of his records to reflect such actions.

Dr. Fisher's complaint asserted that jurisdiction in the Court of Federal Claims was founded upon 28 U.S.C. § 1491 (the Tucker Act), 10 U.S.C. § 8011 *et seq.* (Air Force organizational statutes), 10 U.S.C. § 1201 *et seq.* (military disability retirement statutes), 10 U.S.C. § 1552 (military correction board enabling statute), and Air Force rules and regulations relating to medical standards and disability retirement. The Government filed a motion to dismiss for lack of jurisdiction.

After oral argument on the issue, the trial court granted the government's motion. The trial court held that Dr. Fisher's claim was outside the scope of the Tucker Act because any monetary entitlement was dependent upon a declaratory judgment, which the court lacked authority to grant. *Fisher v. United States,* No. 00–740C (Fed.Cl. Jan. 7, 2002).

---

1. The Government does not argue that Dr. Fisher, by accepting transfer from active duty to the Reserves, waived his right to a military disability retirement.

The trial court, citing *Rice v. United States*, 31 Fed.Cl. 156 (1994), *aff'd,* 48 F.3d 1236 (Fed.Cir.1995) (summary affirmance), noted that in *Rice* a challenge to a determination regarding fitness for duty was deemed nonjusticiable even if the court possessed subject matter jurisdiction. Although the trial court in this case favorably cited that alternative holding of *Rice,* the court did not decide the case on that ground, stating that, because the court did not have jurisdiction under the Tucker Act to hear the case, it was unnecessary to address the Government's alternative argument that Dr. Fisher's claim was not justiciable. The trial court dismissed the complaint, and Dr. Fisher filed a timely appeal with this court. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

### A. Tucker Act Jurisdiction

Separating the question of a federal court's subject matter jurisdiction over a cause from the question of what a plaintiff must prove in order to prevail in the cause is, in many areas of the law, not a difficult matter: a specific statute sets the court's jurisdictional parameters; a separate statute or regulation or common law rule establishes the right that allegedly has been breached. In Tucker Act jurisprudence, however, this neat division between jurisdiction and merits has not proved to be so neat. In these cases, involving suits against the United States for money damages, the question of the court's jurisdictional grant blends with the necessary waiver of the Government's sovereign immunity. Combined with the question of the plaintiff's grounds for the claim, this mixture has been a source of confusion for litigants and a struggle for courts. The Government's arguments, on which it pre-

vailed at trial, and the trial court's view of the matter, require that we address this confusion.

■ It is hornbook law that the Tucker Act (of which there are several versions [2] —it is the Big Tucker Act with which we are here concerned) both confers jurisdiction upon the Court of Federal Claims and waives the Government's sovereign immunity for certain actions for monetary relief brought against the United States. *See United States v. Mitchell,* 463 U.S. 206, 212–18, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *United States v. Testan,* 424 U.S. 392, 397–98, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Under the Act, the waiver of sovereign immunity relates to claims against the United States "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

■ The Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages. *Mitchell,* 463 U.S. at 216, 103 S.Ct. 2961; *Testan,* 424 U.S. at 398, 96 S.Ct. 948. In the parlance of Tucker Act cases, the source must be "money-mandating." *See Mitchell,* 463 U.S. at 217, 103 S.Ct. 2961; *Testan,* 424 U.S. at 398, 96 S.Ct. 948.

The Supreme Court has explained that, for jurisdictional purposes, a statute or regulation is money-mandating if it "can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties [it] im-

---

**2.** There are the (Big) Tucker Act, 28 U.S.C. § 1491; the Little Tucker Act, 28 U.S.C. § 1346(a)(2); and the Indian Tucker Act, 28 U.S.C. § 1505.

pose[s]." *Mitchell,* 463 U.S. at 217, 103 S.Ct. 2961. Recently, in *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003), the Supreme Court revisited and restated this test for determination of whether a statute is money-mandating for Tucker Act jurisdictional purposes. After repeating the test from *Mitchell,* the Supreme Court stated that:

> This "fair interpretation" rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity. "Because the Tucker Act supplies a waiver of immunity for claims of this nature, the separate statutes and regulations need not provide a second waiver of immunity, nor need they be construed in the manner appropriate to waivers of sovereign immunity." *Mitchell II, supra,* at 218–219, 103 S.Ct. 2961, 77 L.Ed.2d 580. It is enough, then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be "lightly inferred," 463 U.S. at 218, 103 S.Ct. 2961, 77 L.Ed.2d 580, a fair inference will do.

*White Mountain,* 537 U.S. at 472–73, 123 S.Ct. 1126.

We read *White Mountain* to have revised the *Mitchell* test for determining whether a statute is money-mandating for purposes of jurisdiction in a Tucker Act suit. The previous test of "fairly interpreted as mandating compensation" is now stated as whether the statute in question is "reasonably amenable to the reading that it mandates a right to recovery in damages" and while such a reading is not to be "lightly inferred," a "fair inference" that money damages are allowable under the statute or regulation in question will suffice.

This new test states the basis for determining whether the Court of Federal Claims has jurisdiction to address the merits of a Tucker Act suit. The new test clearly lowers the threshold for establishing that a statute or regulation is money-mandating, for it replaces a normal "fairly interpreted" test with a less-demanding test of "reasonable amenability" based on "fair inferences."

■ Under the precedent of this court, a Tucker Act plaintiff may address the issue of whether a statute or regulation is money-mandating for jurisdictional purposes by making a non-frivolous allegation that the statute or regulation in question meets the test for money-mandatingness. *See Gollehon Farming v. United States,* 207 F.3d 1373, 1379 (Fed.Cir.2000) (following *Banks v. Garrett,* 901 F.2d 1084 (Fed. Cir.1990)). Thus, under *White Mountain,* when a Tucker Act plaintiff makes a non-frivolous allegation that a particular statute is reasonably amenable, with fair inferences drawn, to a reading that it mandates money damages, a basis for jurisdiction is stated.

If during the further proceedings it is established that the statute in question is not to be so read, as occurred in *Gollehon* and *Banks,* then the case is dismissed for failure to state a claim on which relief may be granted. Meshing the two-step inquiry permitted by our precedent with the new, more relaxed, test of money-mandatingness in *White Mountain* raises the issue of whether the new test applies both at the initial jurisdictional inquiry, when a non-frivolous allegation will suffice to lay the jurisdictional base, and also in a second step if the issue is pressed further to test the legitimacy of the merits case. In short, the question is whether the Supreme Court meant in *White Mountain* to establish a single one-step test for money-mandatingness governed by the new more

relaxed *White Mountain* test, or whether our two-step *Gollehon* procedure remains permissible. In the latter case, the question then is whether the *White Mountain* test applies only at the initial, jurisdiction step, with the more traditional "fair interpretation" rule governing the question of whether the statute, on its merits, is money-mandating, or whether the *White Mountain* test applies at each step of the inquiry.

The dissent complains that something more than a non-frivolous allegation is required, and that by following our *Gollehon* precedent we have "diluted the test [under *White Mountain* ] so that it is not merely lax; it is virtually non-existent." (Diss. op. at 1389.) The dissent misapprehends our position, and confuses process with substance. The process by which a plaintiff undertakes the required jurisdictional showing ordinarily will occur in the context of the initial pleading, a well-pleaded non-frivolous complaint. If the showing meets the test, nothing more need be done to establish the trial court's jurisdiction. Of course, plaintiff's initial showing is subject to challenge as a substantive matter, either by the Government in a timely motion for dismissal for lack of jurisdiction, or by the court sua sponte, since courts are responsible for their own jurisdiction. Either way, if the trial court adjudges that plaintiff does not have a money-mandating source that meets even the new low-threshold jurisdictional test, a dismissal under Rule 12(b)(1) for lack of jurisdiction is appropriate, and that is the end of the matter (subject to review on appeal).

Assuming, however, that plaintiff has passed the jurisdictional test, and the case proceeds to trial, there remains for subsequent determination the question of whether, again as a matter of substance, plaintiff has a winning case on the merits. Here the dissent asserts that the same "lax" jurisdictional test is also the test on

the merits: once plaintiff shows there is jurisdiction, plaintiff has proven there is a winning money-mandating source (subject "to other legal and factual issues" in the case). The dissent finds this result from reading *White Mountain*.

We agree with the dissent that *White Mountain* could be read that way. The language in the majority opinion, and the way the dissent in the case expressed its objections, could be read to mean that the Court in *White Mountain* proceeded to abolish the traditional statutory interpretation test regarding the merits of a Tucker Act case, and substituted instead specially for Tucker Act cases the "fair inference" test. We are not ready to make that leap. The dissent's reading loses sight of the issue before the Supreme Court: certiorari was granted solely on the question of jurisdiction, and both the majority and the dissent begin their opinions by stating that jurisdiction of the Court of Federal Claims under the Tucker Act is the issue to be addressed. Neither opinion purports to address the merits of the case, much less decide them under a newly-fashioned test for determining the merits of an alleged money-mandating source.

Because of the difficulty, as well as the importance to litigants and the Government, of the answers to the questions here raised, we believe they will benefit from full briefing and argument by counsel and, if sought, by concerned amici. The questions arise from our independent assessment of the law, and are not ones that the parties have yet addressed. Since we conclude, as we explain below, that under governing precedent Fisher's complaint is sufficient to establish jurisdiction, and the merits of his case are not before us, we think it prudent to leave exploration of the questions regarding how to test the merits of the case to the parties and the trial court on remand in the first instance.

With this background we can address the first question, what must a plaintiff establish regarding a money-mandating source in order for the Court of Federal Claims to have subject matter jurisdiction over the case under the Tucker Act. Dr. Fisher alleges that 10 U.S.C. § 1201 provides the basis for his Tucker Act claim. Section 1201 enables the Secretary of a military branch to authorize disability retirement pay for service members on active duty. Subsection (a) provides in relevant part:

> Upon a determination by the Secretary concerned that a member described in subsection (c) [i.e., on active duty] is unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay ..., the Secretary may retire the member, with retired pay ..., if the Secretary also makes the determinations with respect to the member and that disability specified in subsection (b).

10 U.S.C. § 1201(a). Subsection (b) requires the Secretary to make certain determinations, including that "the disability is of a permanent nature and stable," and that "the disability is not the result of the member's intentional misconduct or willful neglect."

In this case, Dr. Fisher has little difficulty establishing that § 1201 is reasonably amenable to the reading that it is money-mandating. Section 1201 was the statute alleged to be money-mandating in *Sawyer v. United States*, 930 F.2d 1577 (Fed.Cir.1991). Despite the presence of the word "may" in the statute, in *Sawyer* we determined that the Secretary has no discretion whether to pay out retirement funds once a disability is found qualifying. *Id.* at 1580. Thus, the statute is money-mandating because when the requirements of the statute are met—i.e., when the Secretary determines that a service member

is unfit for duty because of a physical disability, and that disability is permanent and stable and is not the result of the member's intentional misconduct or willful neglect—the member is entitled to compensation. *See id.*

The Government here argues that *Sawyer* should be understood differently. According to the Government, § 1201 is money-mandating only for service members who qualify for benefits under the statute, i.e., those members who have been found by the Secretary to be unfit for duty. But that understanding turns the law on its head—according to the Government the only persons entitled to judicial relief are those who do not need it because they were awarded disability status; those who were denied that status cannot get relief because they were denied what they sought.

Such a perverse understanding of Congress's purpose cannot be the law; it is inconsistent with the literal language of the statute and with our construction of the statute in *Sawyer*. The fact that the statute imposes requirements for the payment of money does not mean that only claimants who have been determined by a Government official to meet those requirements have a right to the money the statute provides. It is the statute, not the Government official, that provides for the payment. If the Government official's determinations under the statute are in error, the court is there to correct the matter, and to have the proper determinations made.

Dr. Fisher contends that the Secretary's determination that he was fit for duty was arbitrary and capricious and contrary to law. He wants the money that would have been his due had he been discharged in the manner to which he claims he was entitled, and he wants the necessary steps taken to position himself for that result—i.e., rein-

statement, etc. That is a classic Tucker Act suit for money and the related remedies the trial court is authorized to grant.

Furthermore, it is not, as the Government also insists, a declaratory judgment over which the trial court lacks jurisdiction. If Dr. Fisher were to succeed on his claim that the Secretary's decision was wrong and should be reversed, he would be entitled to disability retirement pay under § 1201, and whatever procedural remedies were necessary to achieve that result. The Court of Federal Claims is fully empowered to grant such remedies.[3] The trial judges would benefit from a consistent position by Government counsel recognizing the law of this circuit, and we would be spared the time and effort it takes to unscramble process inconsistencies and repeatedly having to explain the law to ill-informed counsel.

The answer to the first question, then, is that Dr. Fisher's well-pleaded, non-frivolous complaint, grounded on a statute that is reasonably amenable to be read as mandating compensation, is sufficient to give the Court of Federal Claims subject-matter jurisdiction to address the case on the merits.

◼ The answer to the second question—what are the consequences, once the court has taken jurisdiction, of plaintiff failing to establish all elements of the cause of action—follows from the answer to the first, though admittedly the answer has not always been stated in a consistent fashion. Assuming that the Court of Federal Claims has taken jurisdiction over the cause as a result of the appropriate initial showing, the consequence of a ruling by the court on the merits, either that the alleged source as a matter of construction does not provide the required money-mandating base for the claim, or that plaintiff's case does not fit within the scope of the source, is simply this: plaintiff loses on the merits.

Certainly it does not follow that, after deciding the case on the merits, the court loses jurisdiction because plaintiff loses the case. Our cases explain that the law is to the contrary. In *Palmer v. United States*, 168 F.3d 1310 (Fed.Cir.1999), we held that a claim by a reserve officer that he had been improperly removed from his billet, thus denying him opportunities for pay, stated a cause of action under the cited pay statute, and thus conferred jurisdiction under the Tucker Act on the Court of Federal Claims. *Id.* at 1313. The ultimate conclusion in the case was that the money-mandating statute alleged did not afford the remedy claimed. That was held to be a failure on the plaintiff's part to state a claim on which relief could be granted, and not a jurisdictional defect. We noted that, when the issue is raised by motion, the proper motion is under Federal Rule of Civil Procedure 12(b)(6), a dismissal for failure to state a claim on which relief can be granted—what the Court of Federal Claims formerly denominated an RCFC 12(b)(4) motion—and not a Rule 12(b)(1) dismissal for lack of jurisdiction.

In some cases the outcome may seem to be the same, whether the trial court describes it in terms of a dismissal for absence of jurisdiction or a judgment under which plaintiff takes nothing. But those are two very different legal conclusions. This is not simply a matter of terminology or of nicety of pleading in motion practice, although that is not unimportant in helping the trial court to focus on the correct issue. The consequences of a court concluding that it is without jurisdiction in a cause are quite different from concluding that a particular plaintiff has failed to prove his case. For example, in *Gollehon Farming* we held that a well-pleaded allegation that

---

**3.** 28 U.S.C. § 1491(a)(2).

money was owed pursuant to a money-mandating statute was sufficient to establish jurisdiction under the Tucker Act. 207 F.3d at 1379. The ultimate determination in the case was that the cited statute was not money-mandating, and that this was a failure to state a claim on which relief could be granted. *Id.* at 1379–80. Nevertheless, since jurisdiction of the trial court properly was based in part on the non-frivolous Tucker Act claim, on appeal this court had jurisdiction over the remaining causes, including a Federal Tort Claims Act claim. *Id.* at 1379.

## B. Justiciability

### 1.

■ Even when a federal court has attended to its subject matter jurisdiction, there remains a question of whether a particular cause is justiciable. Justiciability has both constitutional and prudential dimensions, and encompasses a number of doctrines under which courts will decline to hear and decide a cause. Though justiciability has no precise definition or scope, doctrines of standing, mootness, ripeness, and political question are within its ambit. *See generally* 15 James Wm. Moore et al., *Federal Practice* § 101.01 (3d ed.2003); 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3529 (2d ed. Supp.2003).

One aspect of justiciability relates to the issue of whether deference in a given case should be given by the judiciary to the particular authority and competence of another branch of government.[4] This can arise under basic separation of powers concepts or because Congress has dictated that such deference be given. When is-

sues of Federal military authority are brought to the courts, the constitutional construct may dictate that, in limited circumstances, a particular controversy may be such that a decision maker other than the judiciary should have the final say. In such cases the authority of the Federal courts to protect individual rights and to decide controversies—"[t]he judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, [and] the Laws of the United States ..."[5]— must be balanced against the authority of other constitutional decision makers.

An example is the Executive power vested in the President under Article II, and in particular the President's duties as Commander in Chief of the Army and Navy of the United States.[6] When the question is one of physical or mental fitness for service in the military, courts are loath to interfere with decisions made by the President and his designated agents. It is the President who bears the responsibility for protecting the nation from harm, and the President has broad discretion in the selection of whom he chooses to perform this critical duty. This deference to Executive authority does not extend to ignoring basic due process considerations, however. When there is a question of whether reasonable process has been followed, and whether the decision maker has complied with established procedures, courts will intervene, though only to ensure that the decision is made in the proper manner.

This understanding of the law in military personnel cases by our court is well established. *See, e.g., Murphy v. United States,* 993 F.2d 871, 874 (Fed.Cir.1993)

---

4. When such deference is accorded, the matter is sometimes referred to as a nonjusticiable "political question" (see the authorities cited in the text), though that term can be misunderstood since its more common usage is with regard to electoral politics.

5. U.S. Const. art. III, § 2, cl. 1.

6. U.S. Const. art. II, § 2, cl. 1. The reference in the Constitution to the Army and Navy is understood to include the Air Force and other units of the military services.

("[T]he merits of the Air Force's decision to release [an officer] from active duty are beyond judicial reach."); *Sargisson v. United States*, 913 F.2d 918 (Fed.Cir.1990) (absent procedural error, the decision to release surplus officers and who should be released was a decision for the military to make); *Voge v. United States*, 844 F.2d 776 (Fed.Cir.1988) (statute provided for special pay to medical officers; the decision whether to terminate the award was for the military and nonjusticiable); *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed.Cir.1983) ("[R]esponsibility for determining who is fit or unfit to serve in the armed services is not a judicial province.").

 Though the question of fitness to serve may be nonjusticiable in various contexts, we have consistently noted that a challenge to a particular procedure followed by the military in rendering a decision may present a justiciable issue. *Adkins v. United States*, 68 F.3d 1317, 1323 (Fed.Cir.1995). Even when Congress has given the military discretion in conducting its affairs, the military is bound to follow its own procedural regulations should it choose to promulgate them. *Murphy*, 993 F.2d at 873 (citing *Sargisson*, 913 F.2d at 921). A court may decide whether the military has complied with procedures set forth in its own regulations because those procedures by their nature limit the military's discretion. *Id.* at 873. Such a case presents a justiciable controversy because the 'tests and standards' against which the court measures the military's conduct are inherent in the requirements of the applicable regulation itself. *Adkins*, 68 F.3d at 1323.

### 2.

In one sense, the question before us is Dr. Fisher's fitness for continued service as a medical officer. At the time Dr. Fisher was released from active duty, the Air Force, following established procedures, determined that Dr. Fisher remained fit for duty, and discharged him without designating him as disabled. Thus the question could be considered to be his fitness for duty, and so considered could be understood as a question that is nonjusticiable.

In another sense, however, the question is not whether Dr. Fisher remains fit for duty as a military officer. It is clear that the Air Force does not wish to retain him in active service, and Dr. Fisher has made clear that his request for reinstatement is only for the purpose of positioning himself for obtaining a disability retirement. Rather the question is, once a military serviceperson is released from duty, are the terms and conditions of his release subject to judicial review? Specifically, can courts review the question of whether a former serviceman was entitled under the law to disability pay at the time of release from duty?

As previously noted, the trial court in the case before us decided the matter on jurisdictional grounds, and noted the nonjusticiability issue only in passing. In their initial briefs on appeal, both Dr. Fisher and the Government focused primarily on the jurisdictional question, though both parties did address the justiciability question as well.

The Government argued that fitness determinations by statute are allocated to the discretion of the Secretary (of the Air Force), and that whether to retire a service member and award disability retirement pay upon any finding of unfitness is also left to the discretion of the Secretary. Further, argued the Government, there are no standards by which a court could review such findings. Dr. Fisher responded that the Secretary's discretion is limited by the Air Force's own rules and regulations, which themselves set forth 'tests and standards' against which the Secre-

tary's discretionary conduct may be measured. Dr. Fisher specifically cited Air Force Instruction (AFI) 48–123, *Medical Examination and Standards,* Attachment 2 (Medical Standards for Continued Military Service) (Nov. 14, 2000). In his complaint Dr. Fisher alleged that the Secretary violated this instruction by finding that his diagnosis of seronegative rheumatoid arthritis did not disqualify him from continued service.

On considering the appeal in this case, and having decided that the trial court erred in dismissing on jurisdictional grounds, we examined with some care the question of justiciability. Our review revealed a line of cases decided by our predecessor court, the Court of Claims, not cited by either party, in which that court in military disability discharge cases did not limit its review, as was generally the case in military matters if any review was allowed, to the question of whether proper procedure was followed. Instead, the court reviewed the merits of the military's decision, albeit applying a deferential standard of review.

The line of cases begins with *Towell v. United States,* 150 Ct.Cl. 422, 1960 WL 8475 (1960), in which a former officer in the U.S. Army with a history of active duty medical problems and hospitalization was released from active service. The stated reason was not physical disability, and he was deemed not entitled to a disability retirement. Subsequent review boards, up to and including the Army Board for Correction of Military Records, reaffirmed that his physical disabilities at the time of discharge were not such as to entitle him to disability retirement pay.

When Towell brought his complaint in the Court of Claims, the only official action

by the Army not barred by the statute of limitations was the decision of the Corrections Board.[7] The Court of Claims reviewed the record before that Board, "in order to determine whether its conclusions were supported by substantial evidence." *Id.* at 434. The court concluded that "[w]e find nothing in the record which permits us to say that the Army medical judgment was wrong and as a consequence that the action of the Correction board was erroneous." *Id.* at 435.

*Furlong v. United States,* 153 Ct.Cl. 557, 1961 WL 8689 (1961), is similar. When plaintiff sued for disability benefits the Army denied him, the Court of Claims undertook a review of his records, and concluded that "[w]e do not think that plaintiff has sustained his burden of showing by cogent and clearly convincing evidence that the Retiring Board was arbitrary or capricious in finding that [at the time of discharge] he was not incapacitated for active service." *Id.* at 563.

*Ward v. United States,* 178 Ct.Cl. 210, 1967 WL 8853 (1967), was the first of these cases in which the Government lost. Despite having had his right kidney surgically removed while on active duty, plaintiff was found physically qualified for release from active duty with no physical defects; that finding was affirmed by the Navy's review boards. After reviewing the record, the Court of Claims, citing to *Towell* and *Furlong,* concluded that "[o]n the whole record, it is found that plaintiff was not physically fit for active duty at sea or on foreign service at the time of his release to inactive duty and that the decision of the Board for the Correction of Naval Records to the contrary is not supported by sub-

---

7. *But see Martinez v. United States,* 333 F.3d 1295 (Fed.Cir.2003) (en banc) (Plager, J., dissenting) (en banc court holding that claim accrues on date of discharge and Corrections Board decision does not create a second cause of action for statute of limitations purposes).

stantial evidence and is arbitrary." *Id.* at 219.

*Jordan v. United States,* 205 Ct.Cl. 65, 1974 WL 21686 (1974), followed the *Ward* model, reversing the Army's refusal to grant disability retirement pay to an Army sergeant who, at the time of his discharge, was deemed to be physically fit for duty. In a lengthy decision, the Court of Claims reviewed the medical history plaintiff presented and the records before the Army review boards, including the qualifications of the various doctors. The court concluded:

> Even though defendant's evidence in the instant case, considered of and by itself, might support the administrative decision by the Army to discharge plaintiff as physically fit, we find, as hereinafter discussed, that there is "opposing evidence [principally, plaintiff's medical record with the VA] so substantial in character" as to detract from the weight of the evidence in support of the Army discharge, and to render it "less than substantial on the record as a whole." *Ward, supra.*

*Id.* at 73 (quotes and brackets in original).

As late as 1982, the year this court was established as the successor to the Court of Claims, the Court of Claims was reviewing military disability retirement cases on the merits, applying the substantial evidence in the record/arbitrary and capricious standard. *See de Cicco v. United States,* 230 Ct.Cl. 224, 677 F.2d 66 (1982) (plaintiff loses); *Hinkle v. United States,* 229 Ct.Cl. 801 (1982) (plaintiff loses).

In light of this precedent, which we normally are bound to follow, *see South Corp. v. United States,* 690 F.2d 1368, 1371 (Fed. Cir.1982), we requested from the parties additional briefing on the following questions:

1. Whether the decisions cited above [*Jordan, Ward, Furlong,* and *Towell*] require this court to treat as justiciable an issue of fitness for military duty involving, as it does in this case, a question of disability, and, if so, whether our standard of review of a decision by a Corrections Board on that issue is to determine whether the decision was arbitrary or without substantial evidence in the record to support it;

2. Whether the authority of the above-cited cases has been eroded or over-ruled by later statutes or regulations, or by subsequent decisions of this circuit, *see, e.g., Adkins v. United States,* 68 F.3d 1317 (Fed.Cir. 1995), or by decisions of the Supreme Court;

3. Whether the rationale and holding of *Lindahl v. Office of Personnel Management,* 470 U.S. 768, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985), applies to the scope of our review of fitness determinations made by the military departments, and if so, whether it replaces the standard of review otherwise applicable.

*Fisher v. United States,* No. 02–5082 (Fed. Cir. Oct. 7, 2003) (Order).

### 3.

The parties have filed supplemental briefs, and we have further considered the matter. Our conclusions regarding the three questions are the following.

 With regard to the first question, it is clear from this review that the controlling precedents entitle a discharged service member to judicial review on the merits of the question of eligibility for disability retirement pay. The cases are consistent that this review is conducted under a deferential standard of review, essentially the standard under which administrative agency decisions are reviewed: whether the decision is arbitrary or capricious, unsupported by substantial

evidence, or otherwise not in accordance with law.

The Government in its supplementary brief on the question of justiciability candidly acknowledges that "[b]ecause the decisions in *Jordan, Ward, Furlong,* and *Towell* are based upon general presumptions of reviewability, absent further developments in the law, they would preclude this Court from affording deference to a determination [by the military] of fitness for military duty." Appellee's Supplemental Br. at 4. Dr. Fisher candidly agrees, and notes that, in his view, the decision closest in point to Dr. Fisher's case is *Jordan.* Appellant's Supplemental Br. at 3.

In response to the second question asked, whether the authority of these precedents has been eroded or overruled, the Government argues that the force of the cited decisions of the Court of Claims clearly has been undermined by subsequent cases, in particular *Adkins v. United States,* 68 F.3d 1317 (Fed.Cir.1995). Dr. Fisher denies that *Adkins* had such effect, and cites to several cases decided by the Court of Federal Claims (various trial judges), and in particular *Haskins v. United States,* 51 Fed. Cl. 818 (2002), in which a discharged veteran's suit against the Army for medical retirement with full disability pay was found justiciable (though the veteran lost on the merits).

The Government is correct that our more recent precedents have articulated a standard of judicial review of military service decisions broadly indicating that courts will not address the merits of such decisions. *See, e.g., Adkins,* 68 F.3d at 1323. As we stated earlier, that is a proper standard to apply to the basic question of an individual's eligibility to serve the nation as a war fighter. In *Adkins,* the question was whether the Secretary of the Army acted properly when he removed Adkins' name from the Colonel Army Promotion List. When Adkins took his case to the Court of Federal Claims, that court held it had jurisdiction over the cause, but that the matter presented was nonjusticiable. On appeal, we agreed that the merits of the decision whether to promote or not were nonjusticiable. We further concluded, however, consistent with earlier doctrine, that Adkins was entitled to judicial review of the procedures by which the decision was reached, to ensure that there were no violations of applicable statutes or regulations. The matter was remanded to the trial court for appropriate further proceedings.

*Adkins* was not a disability retirement situation, but a case that addressed directly who should be allowed to serve on active duty, and in what capacity. Our precedents leave little doubt that, absent procedural or due process issues, that issue is for the Executive to decide, not the courts. Thus we find nothing in the specifics of the *Adkins* case, or its outcome, or in other cases on which it relied, to undercut the cited precedents regarding disability retirement pay, even if such "eroding" of prior precedent were to be recognized. Nor are we aware of any statutes or any more recent Supreme Court authority that would dictate a different result.

The Government's argument did not rest entirely on *Adkins* and its broadly-stated propositions. The Government further supported its argument by reference to general principles of respect for military decision making, and the importance of constitutional grants of authority to the President and Congress regarding the waging of war. We are aware of and sensitive to the admonitions contained in Supreme Court cases, such as "judges are not given the task of running the Army," *Orloff v. Willoughby,* 345 U.S. 83, 93, 73 S.Ct. 534, 97 L.Ed. 842 (1953), and "[t]he complex, subtle, and professional decisions as to the composition, training, equipping,

and control of a military force are essentially professional military judgments," *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). Cases like *Adkins* attempt to strike a careful balance between honoring those professional judgments and protecting the due process rights of our citizens.

But the case before us stands outside these admonitions—the issue is not the composition of the military, but the society's legal obligations to those who are no longer within the military forces. We are compelled by logic and the force of precedent to conclude that this question is properly subject to judicial review, and that a deferential standard of review strikes the correct balance here. (Of course, courts can provide review only so long as there are tests or standards by which the decision can be measured.)

This leads to the answer to the third question asked, whether the rationale and holding of *Lindahl v. Office of Personnel Management*, 470 U.S. 768, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985), applies to this case, and should it in effect replace the standard of review utilized by the Court of Claims. *Lindahl* involved the issue of eligibility for disability retirement by *civilian* personnel working for the United States Government. Under the Civil Service Retirement Act, Congress early on had mandated that decisions regarding disability retirement for Federal civilian employees would be made by the Civil Service Commission; subsequently the Supreme Court concluded that such disability retirement decisions could be reviewed by district courts under the Tucker Act. *Id.* at 772, 105 S.Ct. 1620 (citing *Dismuke v. United States*, 297 U.S. 167, 172, 56 S.Ct. 400, 80 L.Ed. 561 (1936)).

Congress later amended the civil service laws to include a finality provision that applied to the Commission's disability retirement decisions. The current version of that provision, not substantively different from the original, provides that "decisions ... [of the designated administrative agency] concerning these matters are final and conclusive and are not subject to review." 5 U.S.C § 8347(c). In interpreting this proviso in 1968, the Court of Claims ruled that the statute strictly limited judicial review. *Scroggins v. United States*, 184 Ct.Cl. 530, 397 F.2d 295, 297 (1968). Courts could not weigh the evidence or even determine whether disability determinations were supported by substantial evidence in the record. The court went on to hold, however, that there remained a residual level of review despite the statute: disability decisions could be reviewed under a highly deferential standard to determine whether there had been "a substantial departure from important procedural rights, a misconstruction of the governing legislation, or some like error going to the heart of the administrative decision." *Id.* (internal quotation marks omitted).

Congress in 1978 replaced the Civil Service Commission with the Office of Personnel Management (OPM). A new Merit Systems Protection Board was to review OPM's decisions in retirement cases. No modifications were made to the finality clause of § 8347(c).

Subsequently, the question arose whether the *Scroggins* rule still applied to disability decisions by OPM. In view of the new civil service statutory provisions, this court concluded that Congress now intended § 8347(c), the finality provision, to mean exactly what it said: there would be no judicial review of civilian employee disability retirement decisions whatsoever; the *Scroggins* rule was deemed no longer operative. *Lindahl v. Office of Pers. Mgmt.*, 718 F.2d 391, 394 (Fed.Cir.1983) (en banc).

The Supreme Court disagreed, and reversed this court, *Lindahl v. Office of Personnel Management*, 470 U.S. 768, 105

S.Ct. 1620, 84 L.Ed.2d 674 (1985). The Court held that the changes to the civil service system did not express a clearly stated Congressional intention to overturn the *Scroggins* residual review standard, and that it remained in effect. *Lindahl,* 470 U.S. at 782–83, 105 S.Ct. 1620. As a result, the *Scroggins* review standard reestablished in *Lindahl* is sometimes now referred to as the *Lindahl* standard. In absence of a more rigorous review standard, it does provide a residual basis on which a court could examine both the process and outcome of an administrative decision.

In its supplemental brief, the Government urges us to adopt the *Lindahl* test as the appropriate standard of judicial review for military disability determinations, arguing that this standard conforms with the deference owed to military decision-making. The Government argues that judicial review of military members was not intended by Congress to be subject to more searching review than that applied to civilian members of the Federal workforce. Furthermore, in the Government's view, since Dr. Fisher does not raise any claims of procedural error as such, if we were to apply the *Lindahl* test there would be no need for a remand for further proceedings.

Dr. Fisher sees no place for the *Lindahl* test in his case, pointing to the fact that *Scroggins* and *Lindahl* turned on an interpretation of § 8347(c), and that there is no parallel statute applicable to the military cases. Dr. Fisher notes that, contrary to the Congressional mandate of nonreviewability in the civilian cases, the broad language of the Tucker Act, specifically 28 U.S.C. § 1491(a)(2), argues in favor of judicial review.

The factual issue in *Scroggins,* in *Lindahl,* and in the case before us is the same: whether the individual is entitled to a disability retirement. The parallels cease at that point. First, Dr. Fisher is correct that the legal framework is quite different. There is no express statute governing military disability case review, as there is in the case of civilian disability cases. Further, as we have explained, the established fabric of judicial review of military disability decisions is fully woven: the military disability cases have their own established standard of review, a standard that strikes a balance between allowing the military to control its membership, while preserving the individual's right to earned retirement pay as provided by law.

Under these circumstances, we see no basis in the case before us under which we could substitute the *Lindahl* residual review standard in place of the review standard established by our precedents. We recognize the anomaly in applying a more deferential standard to review of civilian disability cases than we do to military disability cases. However, in absence of further Congressional guidance, if a more deferential standard of review such as the *Lindahl* test is to be applied in the military disability cases in place of the established substantial evidence/arbitrary or capricious test, that change would have to be made by the Federal Circuit sitting en banc or perhaps by the Supreme Court, if review is granted by either of those bodies.

## III. CONCLUSION

The Court of Federal Claims has jurisdiction to hear the case brought by Dr. Fisher, and the issue raised by Dr. Fisher is justiciable. Accordingly, the matter is remanded to the trial court for further proceedings consistent with this opinion.

*REVERSED AND REMANDED.*

DYK, Circuit Judge, dissenting.

I regret that I cannot join the majority opinion on the issue of jurisdiction. In my view, the test that it applies, drawn from our earlier decision in *Gollehon Farming*

**1388**

*v. United States,* 207. F.3d 1373, 1379 (Fed. Cir.2000), is directly contrary to the teachings of the Supreme Court's recent decision in *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003), which makes clear that the correct test is whether the statute can "fairly be interpreted" as money-mandating, *i.e.,* whether it is "reasonably amenable" to such a construction, *id.* at 472–73, 123 S.Ct. 1126 (quoting *United States v. Mitchell,* 463 U.S. 206, 217–18, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*"Mitchell II "*)).

## I

At some points in its opinion, the majority appears to state the correct test for determining whether a statute is money-mandating. *See, e.g., ante* at 1376–77. Ultimately, however, I understand the majority opinion to hold that, under our decision in *Gollehon,* the Court of Federal Claims has jurisdiction here because the plaintiff has made "*a non-frivolous allegation* that the statute or regulation in question meets the test for money-mandatingness," *i.e.,* that the "statute is reasonably amenable, with fair inferences drawn, to a reading that it mandates money damages." *Ante* at 1377–78 (emphasis added). In *Gollehon,* we held that the "lack of [a] money-mandating statute is not [a] jurisdictional issue." 207 F.3d at 1379 (citing *Palmer v. United States,* 168 F.3d 1310, 1312–14 (Fed.Cir.1999)). Rather, we stated: "The failure to identify a 'money mandating' provision results in such claims being dismissed for failure to state a claim upon which relief can be granted." *Id. Gollehon* held that all that is required to vest the court with jurisdiction is "a nonfrivolous claim for relief," including a non-frivolous allegation that the statute can fairly be interpreted as money-mandating. *Id.* That holding is simply not correct.

Even at the time it was decided, *Gollehon* appeared to be inconsistent with the

Supreme Court's decision in *Mitchell II.* The Tucker Act itself confers jurisdiction only when the action is "founded" on an Act of Congress or other money-mandating source. 28 U.S.C. § 1491(a)(1) (2000). *Mitchell II* stated: "The claim must be one for money damages against the United States, and the claimant must demonstrate that the source of substantive law he relies upon can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." 463 U.S. at 216–17, 103 S.Ct. 2961 (quoting *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)) (internal quotation marks, citation, and footnote omitted). In *Mitchell II,* the Court clearly applied the fair interpretation test to determine that jurisdiction existed:

> We ... conclude that the statutes and regulations at issue here can fairly be interpreted as mandating compensation by the Federal Government for violations of its fiduciary responsibilities in the management of Indian property. The Court of Claims [now the Court of Federal Claims] therefore has jurisdiction over respondents' claims for alleged breaches of trusts.

*Id.* at 228, 103 S.Ct. 2961 (footnote omitted). There was no suggestion in *Mitchell II* that a mere non-frivolous allegation that the statute was fairly interpreted as money-mandating would be sufficient. In any event, the Supreme Court's recent decision in *White Mountain* makes plain that something more than a non-frivolous allegation is required for jurisdiction.

In *White Mountain,* the Court "granted certiorari to decide whether the [relevant statute] gives rise to jurisdiction over suits for money damages against the United States," 537 U.S. at 471, 123 S.Ct. 1126, and it held that the Court of Federal Claims had jurisdiction because the statute "permits a fair inference that the Govern-

ment is subject to duties as a trustee and liable in damages for breach," *id.* at 474, 123 S.Ct. 1126. The Court restated the jurisdictional test so that the "fair interpretation" test is satisfied if the statute is "reasonably amenable" to a money-mandating construction. *See id.* at 472–73, 123 S.Ct. 1126. The Court concluded: "It is enough ... that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be 'lightly inferred,' a fair inference will do." *Id.* at 473, 123 S.Ct. 1126 (quoting *Mitchell II,* 463 U.S. at 218, 103 S.Ct. 2961) (citations omitted). The dissent thought that test too lax:

> As the Court has repeatedly held, the test to determine if Congress has conferred a substantive right enforceable against the Government in a suit for money damages is whether an Act "can fairly be *interpreted* as mandating compensation by the Federal Government for the damage sustained." Instead of faithfully applying this test, however, the Court engages in a new inquiry, asking whether common-law trust principles permit a "fair inference" that money damages are available, that finds no support in existing law.

*Id.* at 481–82, 103 S.Ct. 2961 (Thomas, J., dissenting) (quoting *Testan,* 424 U.S. at 400, 96 S.Ct. 948) (citation omitted). Now, the majority here has gone one step further, holding that all that is required under *Gollehon* is that the complaint make a non-frivolous allegation that the statute is reasonably amenable to a money-mandating construction. *Ante* at 1376–77. The majority has diluted the test so that it is not merely lax; it is virtually non-existent.

All that is required is a non-frivolous allegation of reasonable amenability.

The majority dismisses this concern by stating that it "confuses process with substance." *Ante* at 1377. I am unable to respond because I simply cannot understand what the majority is saying. The issue is the test for jurisdiction, and in my view the majority has clearly gotten it wrong.

## II

The majority reserves a second question that I also think is plainly answered by *White Mountain,* namely whether the money-mandating test is the same at the jurisdictional and merits stages of the case. At both stages, the test is whether the statute can "fairly be interpreted" as money-mandating, or, under *White Mountain,* whether it is "reasonably amenable" to a money-mandating construction.[1] *See, e.g., White Mountain,* 537 U.S. at 473, 123 S.Ct. 1126; *Mitchell II,* 463 U.S. at 218, 103 S.Ct. 2961; *Testan,* 424 U.S. at 400, 96 S.Ct. 948. The *White Mountain* majority made no distinction between the jurisdictional and merits stages. Indeed, the Court affirmed the specific holding of this court that the statute was money-mandating both for jurisdiction and on the merits, *White Mountain Apache Tribe v. United States,* 249 F.3d 1364, 1383 (Fed.Cir.2001) ("In sum, we hold that the Tribe's claim *gives rise to a cognizable claim* for money damages. Accordingly, we hold that the Court of Federal Claims *has jurisdiction* to entertain it." (emphases added)). *White Mountain,* 537 U.S. at 479, 123 S.Ct. 1126. The Court stated that, although the Tucker Act itself does not "create[ ] a substantive right enforceable against the Government by a claim for money damages," *id.*

1. There are, of course, other legal and factual issues concerning the plaintiff's right to recover that are not part of the money-mandating issue. As to those aspects of the claim, the tests are different at the jurisdictional stage (a non-frivolous allegation) and at the merits stage.

at 472, 123 S.Ct. 1126, "a statute creates *a right capable of grounding a claim* within the waiver of sovereign immunity if, but only if, it 'can fairly be interpreted .as mandating compensation by the Federal Government for the damage sustained,'" *id.* (quoting *Mitchell II*, 463 U.S. at 217, 103 S.Ct. 2961) (emphasis added).

The dissent in *White Mountain* also did not distinguish between the jurisdictional and merits stages for purposes of whether the statute was money-mandating. Rather, it expressly would have applied the same test at both stages:

> The majority's conclusion that the Court of Federal Claims *has jurisdiction* over this matter finds support in neither the text of the [Act of Mar. 18, 1960], see Pub.L. 86–392, 74 Stat. 8, nor our case law. As the Court has repeatedly held, the test to determine if Congress *has conferred a substantive right* enforceable against the Government in a suit for money damages is whether an Act "can fairly be *interpreted* as mandating compensation by the Federal Government for the damage sustained."

*Id.* at 481–82, 123 S.Ct. 1126 (Thomas, J., dissenting) (quoting *Testan,* 424 U.S. at 400, 96 S.Ct. 948) (first two emphases added). The dissent further noted: "The Court today fashions a new test to determine whether Congress *has conferred a substantive right* enforceable against the United States in a suit for money damages." *Id.* at 487, 123 S.Ct. 1126 (emphasis added). Thus, neither the majority nor the dissent in *White Mountain* distinguished between the jurisdictional and merits stages.

Just as *White Mountain* and *Mitchell II* applied the fair interpretation test at the jurisdictional stage, *United States v. Na-*

*vajo Nation,* 537 U.S. 488, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003), applied the fair interpretation test at both the jurisdictional and the merits stages. *See id.* at 506, 123 S.Ct. 1079 (setting forth the fair interpretation test as the standard that must be met "*[t]o state a claim* cognizable under the Indian Tucker Act" (emphasis added)).

Nor does our most recent *en banc* decision in this area (decided shortly after *White Mountain* ) in any way suggest different tests for the jurisdictional stage and the merits stage on the money-mandating question. *See Martinez v. United States,* 333 F.3d 1295, 1303 (Fed.Cir.2003) (*en banc* ). So too, Judge Plager's dissent assumed that the test for substantive money-mandatingness is the fair interpretation test. Determining that the pertinent statutes and regulations were money-mandating, Judge Plager stated that they "clearly meet[ ] the test set out by the Supreme Court: the asserted entitlement to money damages depends upon whether any federal statute [or regulation] can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Id.* at 1324 (Plager, J., dissenting) (quoting *Testan,* 424 U.S. at 400, 96 S.Ct. 948) (internal quotation marks omitted) (first alteration added). I would decide the reserved issue by applying the same test for money-mandating at both the jurisdictional and merits stages.

I express no view here as to whether the statute is reasonably amenable to the required money-mandating construction under the correct test.

Accordingly, I respectfully dissent.